Delsea Drive-In Theatres, Inc. v. Commissioner.
Delsea Drive-In Theatres, Inc. v. Commissioner
Docket No. 2067-64.
United States Tax Court
T.C. Memo 1966-6; 1966 Tax Ct. Memo LEXIS 274; 25 T.C.M. (CCH) 15; T.C.M. (RIA) 66006; January 11, 1966
*274 Held, that no part of the consideration paid by the petitioner in connection with its purchase of a one-half stock interest in a corporation constituted consideration for a covenant not to compete and that therefore it is not entitled to deductions claimed in the years in question as representing ratable portions of the cost of such a covenant. Clement J. Clarke, Jr., 2001 Fidelity-Phila. Trust Bldg., Philadelphia, Pa., for the petitioner. Samuel T. Reiner, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax for the taxable years ended April 30, 1959, April 30, 1960, and April 30, 1961, in the respective amounts of $4,565.65, $2,144.84, and $6,490.08. The issue is whether, in connection with the purchase of a one-half interest in a corporation, the petitioner paid any amount for a covenant not to compete, entitling it to the deduction of a ratable portion thereof for each of the taxable years. Some of the facts have been stipulated and are incorporated herein by this reference. The petitioner is a corporation formed under the laws of the State of New Jersey. It computes *275 its income on the cash receipts and disbursements method of accounting and reports such income on the basis of a fiscal year ending April 30. For the fiscal years ended April 30, 1959, 1960, and 1961, it filed Federal income tax returns with the district director of internal revenue at Camden, New Jersey. The total outstanding voting stock of petitioner was 1,500 shares and was held, during the taxable years in issue, as follows: Melvin Fox, president
750 shares
Harry Kalish
150 shares
Marion Fox
200 shares
Lillian Shultz
200 shares
Ada Kalish
200 shares
In 1947 Neil Hellman constructed and commenced operating a drive-in theatre in the area between Philadelphia and Camden, known as the Lincoln Drive-In Theatre. About 1951 it was announced that a development of approximately 25,000 houses, to be known as Levittown, was to be built at a site approximately 8 miles from the Lincoln Drive-In Theatre. [1] Hellman explored the possibility of securing land near Levittown on which to build another drive-in theatre. On December 27, 1952, Hellman entered into a lease commencing on April 1, 1953, covering a tract of land in the Levittown area. The lease called for a fixed *276 annual rental payment of $3,000, and was for a period of 20 years with an option to renew for an additional 20 years. The lease contained no restrictions on the use of the land and provided that it was freely assignable without consent of the lessor. Hellman proceeded to have a topographical map and plans made in connection with the prospective theatre. At that time he became aware of the fact that persons by the name of Sablosky were planning to build a drive-in theatre on property immediately adjacent to the property which he had leased. Hellman then became acquainted with Melvin Fox, a relative of the Sabloskys, who told Hellman that if he would take him in as a partner he would prevail upon his relatives to refrain from building on the adjacent property. Hellman did agree to go into business with Fox, and the Sabloskys were paid an undisclosed sum of money to refrain from building a theatre. In 1953 Hellman and Fox caused to be formed a corporation known as Roosevelt Drive-In Theatre, Inc. (hereinafter referred to as "Roosevelt"), with capital of $5,000. Hellman transferred to such corporation the 20-year lease referred *277 to above, and a drive-in theatre, known as Roosevelt Drive-In Theatre, was constructed on the leased property at a cost of $149,682.55. Fox had been in the motion picture business for approximately 35 years and had interests in other drive-in theatres. Hellman had owned and operated drive-in theatres for more than 15 years. Fox and Hellman agreed that Hellman would manage the theatre. However, in 1955 and 1956 Fox and Hellman had disagreements concerning such management and, as a result, they discussed whether one or the other should dispose of his interest. At that time the outstanding common stock of Roosevelt, consisting of 500 shares, was owned as follows: Melvin Fox
125 shares
Neil Hellman
125 shares
Lewis Sablosky
125 shares
Nettie Hellman (Hell-
man's mother)
125 shares Hellman offered to purchase the interests owned by Fox and Sablosky, but Fox countered with an offer to buy the interests of the Hellmans. Actually Fox did not purchase the stock of the Hellmans. Rather, the petitioner, [2] on March 29, 1956, entered into an agreement with Neil and Nettie Hellman entitled "Stock Purchase Agreement". By the terms of such agreement the petitioner agreed *278 to purchase and Neil and Nettie Hellman agreed to sell the 250 shares of Roosevelt stock owned by Neil and Nettie Hellman. It was therein provided that "The purchase price shall be the sum of $175,000." Such purchase price was to be paid $50,000 on May 1, 1956 and the balance in 6 annual installments commencing in 1957. The negotiations for the above agreement was carried on on behalf of the petitioner by Fox and Harry Kalish. After the terms of the above agreement had been orally agreed upon but before the written agreement was executed, Hellman suggested that there should be an agreement that if Fox should decide to build a drive-in theatre within a 7-mile radius of the Lincoln Drive-In Theatre Fox should offer him a 50% interest therein. Fox and Kalish agreed, but stated that there should be a like agreement on the part of Hellman in the event he should build in the area of the Roosevelt Drive-In Theatre. At the suggestion of Kalish and Fox, Hellman's lawyer then drew up a letter addressed *279 to Melvin J. Fox dated March 23, 1956, which Hellman signed, reading as follows: In connection with the stock purchase agreement about to be entered into between Delsea Drive-In Theatre, Inc. as purchaser, and myself and Nettie Hellman as sellers, and as an inducement for entering into such agreement, you and I have individually agreed as follows, intending to be legally bound hereby: In the event that either of us shall within ten years from this date, either directly or indirectly become the owner of any interest whatsoever, whether through a corporation, partnership or sole proprietorship, or in any other manner, in any drive-in theatre located within a seven-mile radius of either the Roosevelt Drive-In Theatre or the Lincoln Drive-In Theatre, then the one acquiring such interest shall immediately offer to the other one half of such interest, for a price equal to one half of the cost of acquiring such interest, and upon identical terms as to payment therefor. If you agree to the foregoing, kindly so indicate in the space provided below on the enclosed carbon copy of this letter, and return the same to me, whereupon this letter shall constitute a binding contract between us. *280 On March 29, 1956, Fox indicated his agreement by signing the copy of the letter. The balance sheet of Roosevelt as of March 31, 1956, shows assets of a net book value of $108,280.08, liabilities of $78,785.11, and total net assets of $29,494.97. Such balance sheet also shows contributed capital of $5,000, retained earnings to April 1, 1955, of $14,987.96, profits from April 1, 1955 to March 31, 1956, of $9,507.01 (or a total of retained earnings of $24,494.97), and total stockholders' equity of $29,494.97. The books of Roosevelt show net income for the taxable years ended March 31, 1956 through March 31, 1959, in the respective amounts of $9,507.01, after subtracting Federal and state income taxes of $4,753.51; $20,150.80, [3] after subtracting Federal and state income taxes of $12,801.48; $11,233.54, after subtracting Federal and state income taxes of $5,522.56; and $8,712.70, after subtracting taxes of $4,480.83. Such books show net losses for the taxable years ended March 31, 1960 and 1961, in the respective amounts of $444.81 and $206.45. *281 In each of its income tax returns for the taxable years ended April 30, 1959, 1960, and 1961, the petitioner deducted an amount of $12,500 as amortization of a "Non-compete Agreement". Therein it was shown that the $12,500 constituted the yearly amortization of an amount of $125,000 amortizable over a period of 10 years. In the notice of deficiency the respondent disallowed the claimed deduction for each year stating: It is determined that you are not entitled to the deductions claimed in your income tax returns in the amount of $12,500.00 * * * for the amortization of an alleged covenant not to compete. Hellman, for income tax purposes, treated the receipt of his portion of the $175,000 payment as resulting in capital gain upon the sale of his Roosevelt stock and reported such gain on the installment method. Opinion The petitioner contends that $125,000, or at least some portion, of the amount of $175,000 paid by it to the Hellmans in connection with its purchase of their one-half stock interest in Roosevelt represented the cost to it of a covenant by Neil Hellman not to compete with the petitioner for a period of 10 years, and that therefore it is entitled to amortize *282 and deduct such amount over a period of 10 years, including the taxable years in question. The respondent contends that the full amount of $175,000 constituted the purchase price of the stock. Among other things he contends that the petitioner was not a party to any covenant not to compete; that the letter agreement between Fox and Hellman individually did not purport to protect the petitioner against any competition and was not enforceable by the petitioner against the sellers; and that no portion of the $175,000 is allocable to Hellman's undertaking in the letter agreement, the consideration for such undertaking being the reciprocal undertaking of Fox. It is true that the letter agreement was between Fox and Hellman in their individual capacities and did not specifically prevent Hellman from competing with the petitioner. It provided that if either of the individuals should obtain an interest in any drive-in theatre in the area of the Roosevelt Drive-In Theatre or the Lincoln Drive-In Theatre the other individual should have the right to purchase one-half of such interest at cost. However, Fox testified that the purpose of the letter agreement was to restrict himself and Hellman *283 to the two theatres in which they held interests in that area, and that the letter agreement was an essential part of the deal by which the petitioner purchased the stock of the Hellmans. Hellman testified that neither he nor Fox in reality had any intention of operating another theatre in that geographic area, but that the agreement was executed in order to protect from competition their respective interests in the two existing theatres. The petitioner contends, in effect, that under these circumstances the letter agreement between the individuals in reality constitutes a covenant for the benefit of the petitioner, that it had value, and that some portion of the consideration paid by the petitioner to the Hellmans must be allocated thereto. We find it unnecessary to decide whether the letter agreement constituted a covenant by Hellman not to compete with the petitioner, entered into by Fox with Hellman for the benefit of the petitioner. Assuming, arguendo, that the petitioner's contention to such extent is correct, we nevertheless are of the opinion that the petitioner cannot prevail, since we cannot conclude that any portion of the $175,000 paid by the petitioner was paid for Hellman's *284 undertaking in the letter agreement. In the first place, the stock purchase agreement specifically provides that the purchase price of the stock shall be the sum of $175,000, and no mention is made therein of a covenant not to compete. Moreover the letter agreement does not set forth any monetary consideration for Hellman's undertaking. The failure of the parties to allocate any part of the consideration to a covenant not to compete is strong evidence that no such allocation was in fact intended. See , affirming a Memorandum Opinion of this Court. It is true that such failure is not conclusive. The intention of the parties must be ascertained from a consideration of the record as a whole. , and , affirmed (C.A. 4) , certiorari denied . However, upon a consideration of all the evidence of record in the instant case, we must conclude that it was not the intent of the parties that any portion of the $175,000 should constitute consideration for *285 a covenant not to compete. It is evident from the testimony that neither party during the negotiations ever fixed a monetary value for a covenant not to compete. Hellman testified that he considered the one-half stock interest which Fox and Sablosky owned in Roosevelt to be worth $175,000 and that he offered to purchase their interests for $175,000; that Fox then counteroffered to purchase the one-half interest of the Hellmans for $175,000; that the price for the stock was fixed before there was any discussion concerning a covenant not to compete; that he was the one who initiated the discussion as to a covenant not to compete; that Fox was agreeable but wanted a mutual covenant; and that the drafting of the letter agreement was left to Hellman's attorney. Fox testified that he insisted upon the letter agreement as an essential part of the deal; that he felt that the covenant not to compete was worth a great deal more than the stock of Roosevelt that was purchased; that after the sales agreement was drawn he and his accountant discussed the details; and that he concluded in his own mind that of the amount of $175,000 that had been agreed upon, $125,000 should be allocated to the *286 agreement not to compete and $50,000 should be allocated to the stock purchased. Fox did not dispute the testimony of Hellman that the price of the stock was fixed before there was any discussion of a covenant not to compete. Nor did he testify that in any of the discussions leading up to the agreement the parties attempted to place any monetary value upon any covenant not to compete. There was, therefore, no meeting of the minds of the parties with respect to any allocation of the amount of $175,000 to a covenant not to compete. The record shows that Fox and Hellman had substantial reasons for a reciprocal agreement restricting competition in the geographic area in question, and we think it logical to conclude that the consideration passing for the undertaking of each of the individuals was the corresponding undertaking of the other. The fact that the letter agreement was valuable and may have been an inducement for the purchase of the stock by the petitioner does not in itself permit or require any allocation of the $175,000 consideration thereto since, as stated, we are satisfied that the parties did not intend that any part should be allocated thereto. See , *287 wherein it was stated in part: It is true, as the Tax Court found, that the covenant not to compete played a very real part in the negotiation of a final contract between the parties, and was a valuable benefit to the petitioner. But if the parties did not intend that a part of the purchase price be allocated to this important and valuable covenant, that intention must be respected. * * * The petitioner's principal argument is that the Roosevelt stock acquired from the Hellmans was worth far less than the $175,000 paid to the Hellmans, and that therefore it is obvious that some portion of such amount was paid for the covenant of Hellman contained in the letter agreement. It is its contention that the Hellmans' one-half stock interest in Roosevelt was worth no more than $50,000 to $60,000 and that the balance of $115,000 to $125,000 should therefore be allocated to the letter agreement. [4] But even if the amount paid by the petitioner was more than the fair market value of the stock acquired, we could not conclude that the excess is allocable to a covenant not to compete since, as pointed out above, the parties negotiated the sale price of $175,000 prior to the discussions of any *288 covenant not to compete and did not intend that any portion of the $175,000 should constitute consideration for any agreement not to compete. *289 In view of the foregoing, we conclude that the respondent did not err in denying the claimed deductions. Decision will be entered for the respondent. Footnotes
1. In 1956 Levittown was still being developed.↩
2. The evidence does not show the amount of stock of the petitioner owned by Fox in 1956, although it is shown that in the years in question he owned 750 of the 1,500 outstanding shares.↩
3. The gross income for this year includes an item of $15,000 representing "Distributors Settlement," which is a nonrecurring item. There is included in expenses for that year an item of $6,122.72 as "Legal and Professional Fees," which is about 8 times the average of such fees for the other years mentioned.↩
4. In support of such contention as to the value of the stock, the petitioner points to the fact that Roosevelt's balance sheet as of March 31, 1956, reflects a book value of all its assets, and hence of all its stock, of about $30,000, and the fact that Roosevelt's net income, after Federal and state taxes, for the taxable year ended March 31, 1956, was $9,507.01. The petitioner also relies upon the opinion testimony of a theatre operator, that the stock of Roosevelt (apparently all of the stock of that company) had a value of about $60,000. While we have found it unnecessary to make a finding as to the fair market value of the stock acquired by the petitioner, we consider it pertinent to observe that we have serious doubt that the petitioner has shown that the stock was worth less than the $175,000 recited in the stock purchase agreement. The book value is not, of course, determinative of fair market value. Furthermore, the balance sheet does not reflect any value for the lease, for goodwill, or for prospective increase of earnings due particularly to the continuing development of Levittown. The opinion testimony was based in large part upon such balance sheet. Petitioner points to the fact that commencing with the taxable year ended March 31, 1959, the earnings of Roosevelt began to decline, but that fact has no bearing upon the valuation of the stock as of March 1956.↩