<em>Decision will be entered under Rule 50.</em>

RICH HILL INSURANCE AGENCY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7086–70. Filed July 17, 1972.

Jim Schneider (an officer), for the petitioner.
*David A. Pierce*, for the respondent.

FORRESTER, *Judge:* Respondent has determined a deficiency of $1,564.07 in petitioner's income tax for the taxable year 1967. The only issue presented for our decision is whether petitioner is entitled to a deduction for the depreciation of a covenant not to compete.

---

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation and exhibits attached thereto are incorporated herein by this reference.

At the time of the filing of the petition herein petitioner's principal office was in Rich Hill, Mo. Petitioner filed its corporation income tax return with the Internal Revenue Service in St. Louis, Mo.

In 1967 Rich Hill, Mo., had a population of about 1,700. It was located in Bates County some 80 miles south of the Kansas City area. Two larger towns near Rich Hill were Nevada with a population of some 9,000 people about 20 miles south and Butler with a population of some 4,000 people about 20 miles north.

One of petitioner's predecessors was the Moore Insurance Agency, and one of that agency's original partners or employees was George Flexsenhar (hereinafter sometimes referred to as Flexsenhar). By dint of hard work Flexsenhar purchased the balance of the Moore Insurance Agency and eventually changed its name to the Rich Hill Insurance Agency (hereinafter sometimes referred to as the agency).

Flexsenhar rented office space for the agency in a local bank building. The office, which had four desks, the usual files and records, two telephone lines, and a private office for Flexsenhar, covered an area of about 20 feet by 25 feet.

The agency represented such companies as Hawkeye Insurance Co., Commercial Standard, Associated Agencies, Travelers' Insurance, State Auto Underwriters, Western Security, Fidelity and Deposit, and Seaboard Underwriters, Inc. While specializing in long-haul truck insurance, the agency's business consisted of both accounts with individuals and commercial accounts with, for example, trucking lines and retail establishments. Although there were two other small insurance agencies in Rich Hill in 1967 neither represented significant competition in the agency's particular insurance area.

Flexsenhar advertised quite extensively and his name was well known in the trucking industry in the local area encompassing Rich Hill, Nevada, and Butler. He was the agency's only salesman and all of the accounts that he developed were the result of personal contacts. He did employ two or three clerks who would write insurance for people who walked into the agency's office, but these employees did not solicit insurance business outside the office.

In the 8 or 9 years during which Flexsenhar operated the agency himself, the agency's business, as indicated by the yearly gross premium volume, more than quadrupled. As of the 11-month period ending November 30, 1964, the agency showed a gross premium of $162,817. The agency's gross income for that period was in the neighborhood of

$30,000. For the 11-month period ending November 30, 1964, the agency's overhead, including such items as rent, phone, heat, and secretarial help, came to $22,485.42.

In 1964 Flexsenhar was 36 years old. By that time he had become well known in his community and in the insurance industry. He also owned the local newspaper, a small novelty shop, and a funeral home in Lebanon, Mo. He was quite active in local and State politics. As was stated in the testimony at trial, Flexsenhar was "a home town boy" who "had made good" in his community.

Into this tale of success entered James C. Schneider (hereinafter referred to as Schneider). Schneider had just started his own insurance agency in Kansas City, Kans., and as of December 1964, had been in business for approximately 8 months. Up to that time he had had no contact with individuals in the Rich Hill area.

One day he received a call from an insured who told him that the agency was for sale and that it could be purchased without any cash changing hands. On or about December 5, 1964, he took a trip to Rich Hill where he contacted Flexsenhar and Adrain Craigmiles, a local banker who was assisting Flexsenhar in the sale of the agency. Schneider looked over the agency's physical plant and records and talked to two of the agency's employees about the agency's business.

On or about December 12, 1964, Schneider met again with Craigmiles and requested additional time to consider the purchase of the agency. However, Craigmiles indicated that because of certain financial conditions Schneider would have to act immediately if he intended to purchase the agency. It was under these circumstances that Schneider decided to purchase the agency.

Thus, on December 12, 1964, Schneider purchased all of the interest of George W. Flexsenhar and Therese Flexsenhar in the Rich Hill Insurance Agency, an unincorporated business. The sale was effected by a contract which was signed by Schneider as buyer and George W. and Therese Flexsenhar as sellers. The contract provided in pertinent part as follows:

This contract and agreement entered into this 12th day of December, 1964, by and between George W. Flexsenhar and Therese Flexsenhar, doing business as Rich Hill Insurance Agency of Rich Hill, Missouri, hereinafter referred to as sellers; and James C. Schneider of Kansas City, Kansas, hereinafter referred to as buyer.

For and in consideration of the sum of one dollar cash in hand paid by the buyer to sellers, the receipt of which is hereby acknowledged, and subject to further considerations and conditions as hereinafter set out.

The sellers hereby convey and sell all of their right, title and interest in the Rich Hill Insurance Agency, Rich Hill, Missouri, with all of its equipment, furniture, fixtures, insurance policy expirations, accounts receivable and all assets whatsoever.

The buyer agrees to assume only the liability of the accounts current payable to various insurance companies (for payment of insurance premiums) represented by said Rich Hill Insurance Agency which amount the sellers represent not to exceed more than $50,000.00. The sellers agree that in the event said accounts payable exceed this amount then the buyer herein may refuse to pay same.

*The sellers further agree that they will not engage in the insurance business in any way within a radius of 100 miles of Rich Hill, Missouri, for a period of five years from the date hereof.* [Emphasis supplied.]

The effective date of this agreement is the date of the signing hereof.

Schneider insisted that the covenant not to compete be put in the contract and that he would not purchase the agency without that covenant. But though the contract included the above-emphasized paragraph, the paragraph was not bargained for independently. Nor did the parties to the contract allocate any part of the purchase price to the covenant not to compete. As part of the purchase, Schneider believed that he was buying, among other things, the agency's goodwill, records, insurance expirations, and contacts with insureds and potential customers.

As indicated in the contract Schneider agreed to assume the agency's outstanding liabilities to a limit of $50,000. In addition Schneider agreed to assume Flexsenhar's liability on four notes totaling $51,000. He also entered into an agreement with the Security Bank of Rich Hill to guarantee $32,000 worth of notes which covered various insurance policies which Flexsenhar or his agency had financed through the bank. Schneider also assumed liability for an advertising lease agreement and for approximately $1,400 in miscellaneous outstanding bills. Thus, at the time of the purchase no money changed hands, as the purchase consisted entirely of Schneider's assumptions or guarantees of various liabilities which were outstanding against Flexsenhar or the agency.

Although the record is far from clear, it indicates (and we find) that the total purchase price was approximately $100,000, not including the guarantee of $32,000 that Schneider gave to the Security Bank. Schneider assumed only a secondary liability on these $32,000 of notes and eventually had to pay only about 10 percent or $3,200.

After selling the agency Flexsenhar remained in the Rich Hill area for a year to a year and a half. During that time he sold the funeral home and newspaper which he had owned. He then moved to Jefferson City, Mo., where he went to work for the State as a director of the occupational accidents and building inspection department. However, he often came back to Rich Hill to visit his mother and grandmother.

On their joint Federal income tax return for 1964, George W. and Therese Flexsenhar reported all of their gain from the sale of the

agency as capital gain, not allocating any part of it to a covenant not to compete.

Because of the financial condition of the agency at the time of the purchase Schneider anticipated operating from and continuing to live in Kansas City as he was not expecting to earn a reasonable living from the agency itself.

On April 14, 1965, petitioner was incorporated under the laws of Missouri to engage in the business of selling insurance. While Schneider had been the sole purchaser of the agency, at the time of incorporation there were four other stockholders.

On April 14, 1965, petitioner's balance sheet showed the following assets:

| | |
|---|---:|
| Cash | $8, 223. 87 |
| Notes and accounts receivable | 16, 224. 85 |
| Supplies | 175. 00 |
| Buildings and other fixed depreciable assets, net of amortization and depreciation | 8, 273. 71 |
| Refundable deposits | 50. 00 |
| Investments | 250. 00 |
| Policy expirations | 78, 993. 76 |
| Goodwill | 6, 127. 15 |
| Total assets | 118, 318. 34 |

On its 1967 corporation income tax return (Form 1120) petitioner for the first time attributed $35,547.19 of the $78,993.76 of policy expirations as representing the cost or other basis of the covenant not to compete. It deducted one-fifth of that amount, or $7,109.43, as depreciation for 1967 in respect of the covenant not to compete. In neither its taxable year 1965 nor its taxable year 1966 had petitioner attributed any part of the policy expirations as representing the cost or other basis of the covenant not to compete, nor had it claimed any deductions for depreciation in respect of said covenant.

Since having purchased the agency, Schneider, directly or indirectly, has purchased interests in other insurance agencies in the same area of Missouri.

In August 1968, petitioner entered into a purchase agreement for an insurance agency in Schell City, Mo. Since the seller was having difficulties and would be leaving the area for a length of time, Schneider did not fear competition from him so that a covenant not to compete was neither discussed nor incorporated in the purchase agreement.

In February 1969, petitioner purchased a small agency in Rockville, Mo. Neither petitioner nor Schneider requested a covenant not to compete as a part of the sale because the seller had generated very little business in the past and would have had trouble attracting another company to represent.

In February 1969, Schneider was involved in the purchase of an agency in Nevada, Mo. Since the seller was going to continue to live in the area and to continue in the real estate business, Schneider asked that a covenant not to compete be placed in the sale contract. The price agreed upon for the covenant came to 50 percent of the total purchase price.

In April 1969, Schneider was involved in the purchase of an agency in Lamar, Mo. At the time of the purchase the agency was owned by the previous owner's widow and she had been operating the agency for 3 years. Since she was well known in the area and was going to continue to live in the area after the purchase, she entered into a covenant not to compete with Schneider. The price agreed upon for the covenant came to 50 percent of the total purchase price.

In the latter part of 1969 the Nevada Insurance Agency, in which Schneider had an interest, entered into a agreement to purchase another agency. Since the sellers were up in years and the company they represented was dissatisfied with their performance, Schneider could see no competition from them after the purchase, and no covenant was taken.

In August 1970, petitioner entered into an agreement to purchase an insurance agency in Monett, Mo. As the seller was about 42 years old, was well known in his community, and planned to remain in the community after the purchase, the contract of sale contained a covenant not to compete. The price agreed upon for the covenant came to 50 percent of the purchase price.

### OPINION

In 1964 in consideration of Schneider's assumption of various of Flexsenhar's liabilities, Flexsenhar sold the agency "with all of its equipment, furniture, fixtures, insurance policy expirations, accounts receivable, and all assets whatsoever" to Schneider. While the actual purchase price and the values of the agency's various assets as of the time of sale have not been set forth with dollars-and-cents precision, the inference is clear that the cost of the intangible assets which Schneider received in the sale constituted the major part of the purchase price. As part of the sale Flexenhar also agreed that for 5 years he would not compete in the insurance business in the Rich Hill area. In 1965 the agency was incorporated and the resulting corporation is petitioner here.

Petitioner contends that part of the price attributable to the intangible assets that Schneider purchased is allocable to the covenant not to compete. Respondent, on the other hand, contends that no part of the purchase price is allocable to the covenant.

## 616

The tax problem raised by the parties' disagreement relates to the allowance of a claimed depreciation deduction in respect of the covenant not to compete. In general an intangible asset may be depreciated under section 167 only if its use in the business or in the production of income is for a limited period, the length of which can be estimated with reasonable accuracy. Sec. 1.167(a)-3, Income Tax Regs. No depreciation deduction is allowable with respect to goodwill. Sec. 1.167(a)-3, Income Tax Regs. Respondent contends that the covenant not to compete was an inextricable part of the intangible assets that Schneider purchased and that such intangible assets had no reasonably ascertainable useful life. Petitioner's counterargument is to the effect that over $35,000 is allocable to the covenant not to compete and that since such covenant had a determinable life of 5 years, petitioner should be allowed one-fifth of that sum as a depreciation deduction in 1967.[1]

The question of allocation of a going business' purchase price among such items as a covenant not to compete and nondepreciable intangible assets [2] has been the subject of much discussion and has not lent itself to resolution by the use of any precise or easily applied rules. See, e.g., Note, "Amortization of Intangibles: An Examination of the Tax Treatment of Purchased Goodwill," 81 Harv. L. Rev. 859, 868–869 (1968); Barnet, "Covenants Not to Compete: Their Effects Upon the Covenantor and Covenantee," 18th Ann. N.Y.U. Tax Inst. 861, 864–875 (1960); McDonald, "Goodwill and the Federal Income Tax," 45 Va. L. Rev. 645, 668–673 (1959); Note, "Tax Treatment of Covenants Not to Compete: A Problem of Purchase Price Allocation," 67 Yale L. J. 1261 (1958).

Out of the many cases in the area two basic theories have evolved—the severability theory and the so-called economic reality theory. See, e.g., *General Insurance Agency, Inc.* v. *Commissioner*, 401 F. 2d 324 (C.A. 4, 1968), affirming a Memorandum Opinion of this Court. A perusal of the cases indicates that the two theories often overlap if in fact they do not occasionally merge. However, under either theory or combination of theories, the facts revealed by the record herein fail to persuade us that any part of the purchase price was allocable, or intended to be allocated, to the covenant not to compete. Therefore, under either theory we believe that petitioner's claimed depreciation deduction must be denied.

---

[1] It seems to be assumed in the parties' arguments that if the covenant not to compete is depreciable, petitioner would be entitled to such depreciation even though the original beneficiary of the covenant was Schneider. Compare *Delsea Drive-In Theatres, Inc.*, 25 T.C.M. 15, 17–18 (1966), affd. 379 F. 2d 316 (C.A. 3, 1967).

[2] Here, the nondepreciable intangible assets were primarily goodwill and insurance policy expirations.

Under the severability theory, the covenant not to compete may not be depreciated if it is nonseverable from the transfer of goodwill attendant to the sale of the going business.[3] E.g., *Aaron Michaels*, 12 T.C. 17 (1949). Among the factors tending to show that a covenant not to compete is severable from goodwill are whether the covenant was separately bargained for, whether it was treated in a separate and distinct manner, and whether a severable consideration for it can be shown. E.g., *Barran* v. *Commissioner*, 334 F. 2d 58 (C.A. 5, 1964), reversing on other grounds 39 T.C. 515 (1962); *Benjamin Levinson*, 45 T.C. 380 (1966); *United Finance & Thrift Corporation of Tulsa*, 31 T.C. 278 (1958), affd. 282 F. 2d 919 (C.A. 4, 1960), certiorari denied 366 U.S. 902 (1961).

Unfortunately for petitioner, there is no evidence in this record to show that the convenant not to compete was treated as an element severable from the agency's goodwill. Certainly no separate evaluation of its worth was either discussed or made. It was not bargained for independently and there is no evidence that it was treated in a separate manner. Petitioner must fail under this first test.

The economic reality test seeks to determine the economic reality of the transaction between the buyer and seller by ascertaining the parties' intent at the time they entered into the purchase agreement. *General Insurance Agency, Inc.* v. *Commissioner, supra* at 329–330. Thus, a part of the purchase price represents payment for a covenant not to compete only if the parties to the agreement intended to allocate a portion of the purchase price to the covenant at the time they entered into the agreement.[4] E.g., *Fulton Container Co.* v. *United States*, 355 F. 2d 319 (C.A. 9, 1966); *Levine* v. *Commissioner*, 324 F. 2d 298 (C.A. 3, 1963), affirming a Memorandum Opinion of this Court; *Annabelle Candy Co.* v. *Commissioner*, 314 F. 2d 1 (C.A. 9, 1962), affirming a Memorandum Opinion of this Court.

We find that petitioner has not carried its burden of persuading us that Flexsenhar and Schneider intended, at the time they entered into the agreement, to allocate any part of the purchase price to the covenant not to compete.

---

[3] The severable-nonseverable distinction has fallen into some disfavor because every covenant not to compete is nonseverable from goodwill in the sense that each such covenant is executed in order to protect goodwill. E.g., *Balthrope* v. *Commissioner*, 356 F.2d 28, 31 (C.A. 5, 1966), affirming a Memorandum Opinion of this Court; *Schulz* v. *Commissioner*, 294 F.2d 52, 55–56 (C.A. 9, 1961), affirming 34 T.C. 235 (1960).

[4] In satisfying this second test petitioner would also have to show that the covenant had "some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." *Schulz* v. *Commissioner*, 294 F. 2d 52, 55 (C.A. 9, 1961), affirming 34 T.C. 235 (1960). Since we find that petitioner has failed to carry its burden of proving that Schneider and Flexsenhar intended any allocation of part of the purchase price to the covenant not to compete, we do not deal with this latter aspect of the economic reality test.

In the first place the fact that the sale agreement contained no specific allocation of the purchase price to the covenant is "pretty good evidence" that no allocation was intended. E.g., *Annabelle Candy Co.* v. *Commissioner, supra* at 7. Furthermore, Flexsenhar and Schneider never discussed allocating any part of the purchase price to the covenant not to compete. Therefore, the indication is that there was never a meeting of minds between Flexsenhar and Schneider with respect to any intention to allocate.

In addition, Flexsenhar reported his gain from the sale of the agency as capital gain and did not allocate any part of that gain to a covenant not to compete.[5] Insofar as this return was evidence of Flexsenhar's intent at the time of sale, it would indicate that Flexsenhar did not intend to allocate any part of the purchase price to the covenant not to compete.

Another indication that Flexsenhar and Schneider did not intend to allocate any part of the purchase price to the covenant not to compete may be derived from what has been revealed of Flexsenhar's plans after the sale. Soon after the sale of the agency to Schneider, Flexsenhar apparently sold his other business interests and left the Rich Hill area for a job with the State in Jefferson City. This fact and the other facts of Flexsenhar's dynamic nature indicate that Flexsenhar's sale of the agency was part of an overall plan to liquidate his business interests in order to begin a new career in the political or governmental sector. Thus, no allocation of the purchase price to the covenant not to compete may have been intended if Flexsenhar had no intention of remaining in the Rich Hill area.

In this regard it is important to note the circumstances of certain other insurance agency acquisitions to which Schneider was a party. In each described instance in which he anticipated competition from the seller, Schneider insisted upon a covenant not to compete and agreed with the seller to allocate part of the purchase price to the covenant. In light of these other similar transactions, Schneider's failure to explain why no allocation was agreed upon in the instant case is further evidence that he did not seriously anticipate competition from Flexsenhar.

It is true that Schneider would have insisted upon the covenant not to compete in order to protect himself against the possibility that Flexsenhar's new life plans would not work out and that in such event Flexsenhar might return to threaten Schneider's interests in the Rich Hill insurance market. But we are not persuaded that such possibility

---

[5] Indeed, if Flexsenhar had treated any part of his gain as being allocable to the covenant not to compete, he would have been obliged to report the gain as ordinary income and not capital gain.

was great enough to support a finding that there was an intention to allocate part of the purchase price to the covenant not to compete.

Finally, we think it significant that petitioner did not begin to depreciate the covenant until 1967, its third taxable year after the execution of the sale agreement. This delay in claiming depreciation is some evidence that Schneider's intention to allocate part of the purchase price to the covenant not to compete was just an afterthought and that such intention did not exist at the time of the execution of the purchase agreement.

While no one of the above factors is in itself conclusive, when weighed together they indicate that petitioner has fallen far short of proving that Flexsenhar and Schneider intended to allocate any part of the purchase price to the covenant not to compete.

*Decision will be entered for the respondent.*