MORTON F. McKINNEY AND MARTHA P. McKINNEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McKINNEY v. COMMISSIONER
Docket No. 9521-76.
United States Tax Court
T.C. Memo 1978-448; 1978 Tax Ct. Memo LEXIS 68; 37 T.C.M. (CCH) 1847-35; November 7, 1978, Filed Dallan W. Martin, for the petitioners. Robert N. Armen, Jr. and Thomas J. Stalzer, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined a deficiency of $5,000 in petitioners' Federal income tax for the year 1971. At issue is whether $20,000 of a sales price of $71,177.32 for an insurance business sold by petitioner Morton F. McKinney's wholly owned corporation to the Mahoning Valley Agency, Inc. in 1971 should be treated as having been paid for a non-competition covenant, *69 taxable as ordinary income, or paid for goodwill and thus taxable as capital gain. FINDINGS OF FACT Some of the facts are stipulated and are so found. Morton F. McKinney (petitioner) and his wife, Martha P. McKinney were legal residents of Youngstown, Ohio, when they filed their petition in this case. Their joint Federal income tax return for 1971 was filed with the Cincinnati Service Center. An amended return for that year was filed on December 14, 1973. Petitioner, who was born in 1913, graduated in 1935 from Clarion State Teachers College, Clarion, Pennsylvania, with a bachelor of science degree. From 1935 to 1940 he was employed as a salesman by an insurance agency in Clarion. From 1940 to 1942 he was employed as an underwriter by the Kaufman and Forrester Insurance Group in Pittsburgh. In 1942 petitioner secured employment with the Liebman-Bonnell-Wood Company (LBW) as an insurance salesman, a position which he held until 1951. LBW was incorporated in 1925 as an Ohio corporation for the purpose of selling insurance on behalf of various underwriters. Throughout its existence and until its dissolution and liquidation, LBW was engaged in the business of selling *70 general insurance in the Youngstown, Ohio, area. In 1945, petitioner acquired five shares of LBW stock. In 1950, he acquired five additional shares. In 1951, he acquired the remaining 258 shares. Subsequently, in 1951 and 1952, he caused 134 shares to be purchased from him by LBW, which shares LBW held as treasury stock until its dissolution and liquidation. Since 1951 and until the dissolution and liquidation of LBW in 1971, petitioner was the president and sole shareholder of LBW and was its secretary-treasurer. He controlled and managed LBW from 1951 until its dissolution and liquidation. During the period that petitioner owned and controlled LBW, he succeeded in building up the business by increasing both gross and net sales, in establishing good personal relationships with clients, in achieving a good reputation, and in providing excellent service to his clients. In short, he was a successful insurance man, and the personal service he rendered to the clients contributed to the growth of his insurance business. In 1971 the petitioner was 58 years of age and in excellent health. Mahoning Valley Agency, Inc. (MVA), an Ohio corporation, has been a general insurance *71 agency engaged in selling primarily life and casualty policies. MVA conducted its business in the Youngstown, Ohio, area. MVA and LBW were competitors in the general insurance business prior to the dissolution and liquidation of LBW. In May or June 1971, MVA approached petitioner about purchasing the LBW insurance business. In an agreement dated July 30, 1971, but signed on August 2, 1971, LBW, acting through the petitioner, and MVA, acting through its officers, Richard A. Wolff and Jacob Levy, contracted for the purchase and sale of LBW's insurance business. Article 3 of the agreement provides as follows: ARTICLE 3. BUYER [MVA] agrees to pay to SELLER [LBW] for the assets, property, business and goodwill included in this sale, the sum of SEVENTY-ONE THOUSAND ONE HUNDRED SEVENTY-SEVEN DOLLARS AND THIRTY-TWO CENTS ( § 71,177.32) computed as follows: Furniture, fixture and supplies
$ 6,517.73
Accounts Receivable
4,659.59
Goodwill
40,000.00
Covenants Not to Compete as
hereinafter provided for
20,000.00
[Article 12]
TOTAL
$ 71,177.32
Article 12 of the agreement provides as follows: ARTICLE 12. The parties hereto do hereby severally *72 acknowledge that BUYER would not purchase the business, assets and property of SELLER, nor pay the sums required of it to be paid therefor, as aforesaid, unless it, its successors, assigns, affiliates and subsidiaries, can enjoy the goodwill of said business, including the continued patronage of any and all customers of SELLER, as well as the right to enjoy the natural growth of said business without interference or molestation, directly or indirectly, by SELLER and SHAREHOLDER. Therefore, for and in consideration of the premises, and the purchase by BUYER of the assets, property and business of SELLER and the agreement of BUYER to pay the purchase price therefor, which will inure directly to the benefit of the SHAREHOLDER, and further in consideration of that part of the purchase price allocated to this covenant as provided for in Article 3 hereof, SELLER and SHAREHOLDER, and each of them, jointly and severally, hereby covenant and agree, which covenant and agreement is hereby acknowledged by the parties hereto to be the essence of the within Agreement, as follows: (a) SELLER and SHAREHOLDER, and each of them, hereby covenant and agree that for a period of five (5) years from and *73 after the date of the execution of this Agreement, they will not divulge the names of any of the customers of the insurance business purchased by BUYER from SELLER, nor the type of insurance said customers have purchased, nor the premiums charged for such insurance, to anyone other than the duly authorized agents and employees of BUYER, its successors and assigns; (b) SELLER and SHAREHOLDER, and each of them, do hereby further covenant and agree that for a period of five (5) years from and after the date of the execution of this Agreement, and within the territory covered by a radius of seventy-five (75) miles from the Mahoning County Court House in Youngstown, Ohio, and within such other and further territory now serviced by BUYER, its affiliated companies (which territory has been described to, and is well known by SELLER and SHAREHOLDER), they will not, directly or indirectly, acting alone or with anyone else, either as partner, employee, shareholder, agent or advisor, of any person, firm or corporation, or in any other capacity or position whatsoever, engage in what is known as the insurance agency business; that they will not, directly or indirectly, acting alone or with anyone *74 else, in any capacity or position whatsoever, or on behalf of any person, firm or corporation, solicit the customers of the insurance agency business this day sold by SELLER to BUYER, or take away, attempt to take away, divert, attempt to divert, interfere with, or attempt to interfere with, the business, patronage and goodwill of any of said customers, as well as any of the other customers of BUYER; its affiliated companies; nor do anything, directly or indirectly, that will diminish, reduce or affect BUYER, its successors, assigns or affiliated companies, or their respective successors and assigns, or deprive them of, in any manner whatsoever, the patronage, business and goodwill of said insurance coverage customers; nor will they, directly or indirectly, acting alone or with anyone else, in any capacity or position whatsoever, solicit any other insurance customers of BUYER, its successors and assigns, for the purpose of taking away, attempting to take away, diverting, attempting to divert, interfering with, attempting to interfere with, affecting or attempting to affect the business, patronage and goodwill of such other customers of BUYER, its successors and assigns, or its affiliated *75 companies, or their respective successors and assigns; (c) The clauses contained in this Article 12 are separate and divisible, and if for any reason any of such clauses should fail or be determined to be unenforceable, the remaining provisions and clauses hereof shall continue and remain in full force and effect. In addition to the petitioner, LBW had in 1971 two employees--a fire underwriter and casualty underwriter--who had worked for the company for 25 years and 15 years, respectively. They went to work for MVA after the sale. Before the execution of the agreement dated July 30, 1971, the petitioner and Richard Wolff, the president of MVA, had several conferences and discussions regarding the value of the insurance "expirations" ($74,366.82), which was derived by multiplying the average annual gross commissions during 1968, 1969, and 1970 by 1 1/2, the customary method in the insurance industry for valuing expirations. The first agreed purchase price was subsequently adjusted by reducing it to $71,177.32 to reflect the elimination from the calculation of the average annual gross commissions of a commission for a blanket bond premium from the Dollar Bank in Youngstown. *76 During the course of the negotiations the petitioner indicated to Mr. Wolff that he intended to retire from the insurance business after the sale took place. However, Mr. Wolff thought oral assurances were not sufficient because the petitioner could change his mind. During the course of the negotiations and before drafting the written agreement, the parties had an oral understanding that the LBW office would remain open and operating for a 30 to 60 day period after closing the transaction to facilitate the termination of the LBW business. However, written drafts of the agreement did not include provisions to keep the LBW office intact. The initial draft of the agreement was prepared by the attorneys for MVA, pursuant to Mr. Wolff's direction, and was delivered to petitioner on or about July 15, 1971. There was included in the initial draft an allocation of $15,000 to a covenant not to compete, which is customary in the insurance agency business. Petitioner told Wolff that he objected to the allocation of $15,000 of the sales price to the covenant not to compete. Wolff insisted on the retention of the allocation clause pertaining to the restrictive covenant. Petitioner *77 again objected to it. Petitioner revised a second draft of the agreement and typed a third draft deleting the allocation clause pertaining to the non-compete covenant. Petitioner's objections reflected an understanding of the tax consequences relating to the sale of a business. After petitioner's revision was delivered to MVA, Mr. Wolff deferred comment on petitioner's objection to the allocation to the covenant not to compete and indicated that the revised draft would again be given to Wolff's attorney. On July 28, 1971, Wolff advised petitioner by telephone that he would not agree to the elimination of the $15,000 allocation from the agreement. On Saturday, July 31, 1971, MVA took possession and control of LBW's files, records, expirations, furniture, and supplies. The move to the offices of MVA was begun then and completed on August 2, 1971. Petitioner wanted full payment of the purchase price on July 31, 1971, but received $2,500 as earnest money from Mr. Wolff with the assurance that the balance would be paid on August 2, 1971, when the final agreement would be signed. On August 2, 1971, petitioner received the final draft of the agreement in which the allocation *78 to the non-compete covenant was increased to $20,000. Changes in the allocations of the purchase price were made from figures furnished by the petitioner. The amount previously allocated to accounts receivable was reduced and the amount allocated to furniture was increased after MVA had a chance to inspect it. Neither the petitioner nor LBW was represented by legal counsel with respect to the sale to MVA. Petitioner read and understood the final agreement prior to its execution. He knew that it contained a clause allocating $20,000 of the total purchase price to the convenant not to compete. When the agreement was signed, the petitioner was familiar with the tax and non-tax consequences of a covenant not to compete. The covenant had been frequently discussed during the course of the negotiations. MVA would not have acquired the insurance business of LBW without a covenant not to compete. Petitioner, acting for LBW, caused the corporation to be dissolved and liquidated on December 3, 1971. Since the sale of the LBW insurance business the petitioner has continued to reside in the Youngstown area. On their 1971 joint Federal income tax return the petitioners treated *79 all of the proceeds received from the sale of the LBW insurance business, including the $20,000 expressly allocated to the covenant not to compete, as long-term capital gain. Respondent, in his notice of deficiency dated July 27, 1976, determined that the $20,000 was paid to petitioner by MVA for his promise not to compete and, therefore, constitutes ordinary income rather than capital gain. OPINION The issue before us here is whether the allocation of part of the purchase price of a business to a covenant not to compete specifically made in an agreement of sale should be recognized for tax purposes, or whether the covenant is a non-severable part of the goodwill transferred so that the allocation to the covenant should be ignored. The determination as to whether a covenant not to compete was actually bargained for is important from a tax standpoint to both the buyer and the seller. This is so because the amount a buyer pays a seller for such a covenant, entered into in connection with the sale of a business, is ordinary income to the covenantor and an amortizable item for the covenantee. Commissioner v. Danielson,378 F. 2d 771 (3d Cir. 1967); sec. 1.167(a)-3, Income Tax Regs. *80 Where there is no covenant not to compete the sale of an entire business generally results in capital gain to the seller, with no amount amortizable by the buyer. We are confronted with the situation where one party to a contract is attempting to show that no value should be placed on a covenant not to compete rather than the value specified in the agreement of the parties. Here the contract between LBW and MVA specifies an allocation of $6,517.73 to furniture, fixtures, and supplies, $4,659.59 to accounts receivable, $40,000 to goodwill and $20,000 to a non-competition covenant. Petitioner contends that he should prevail under either the "severability"test or the "economic reality" test; that he has presented the "strong proof" necessary to overturn the allocation made by the parties to the covenant not to compete; and that the allocation to the covenant was an "artificial sham" achieved through less than good faith bargaining merely to obtain artificial tax benefits for MVA. To the contrary, respondent argues that the facts require a decision in his favor under both tests and that the covenant not to compete was separately bargained for and had an independent basis in fact and *81 a compelling relationship with business reality. We first look at the legal standard by which the burden of proof must be measured. Respondent, as he has done many times before, urges us to formally adopt the rule set forth in Commissioner v. Danielson,supra at 775, rather than the "strong proof" rule of Ullman v. Commissioner,264 F. 2d 305, 308 (2d Cir. 1959), affirming 29 T.C. 129 (1957). The so-called Danielson rule provides that a party to an agreement may not successfully attack the value specified in a contract without "proof which in an action between the parties to the agreement would be admissible to * * * show its unenforceability because of mistake, undue influence, fraud, duress, etc." Commissioner v. Danielson,supra at 775. The Danielson rule, however, has been rejected by this Court. Schmitz v. Commissioner,51 T.C. 306 (1968), affd. sub. nom. Throndson v. Commissioner,457 F. 2d 1022 (9th Cir. 1972). Moreover, the Court of Appeals for the Sixth Circuit, *82 to which this case is appealable, follows the "strong proof" rule of Ullman.See Montesi v. Commissioner,340 F. 2d 97 (6th Cir. 1965). We will continue to follow the "strong proof" rule, namely that when the parties to a transaction such as this one have specifically set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration. * * * [Ullman v. Commissioner,supra at 308.] The courts have used two basic tests in determining whether the substantive elements of a transaction will allow a treatment different from the written contract.The Ullman rule applies to either test so that strong proof will be required under any conditions to overcome the written provisions of the agreement. The "severability" test is the older of the two tests, but less favored by this Court and in some instances rejected or abandoned by the courts of appeals. Cf. Rich Hill Ins. Agency v. Commissioner,58 T.C. 610, 617 (1972); *83 Schulz v. Commissioner,294 F. 2d 52, 55-56 (9th Cir. 1961), affg. 34 T.C. 235 (1960). We held in Michaels v. Commissioner,12 T.C. 17 (1949), that the Court must determine whether the covenant not to compete can be segregated from the rest of the agreement. If the covenant has been dealt with as a separate item, consideration received therefor will be ordinary income. If the covenant is not severable from the assets transferred, capital gains treatment will result. See Toledo Blade Co. v. Commissioner,11 T.C. 1079 (1948), affd. 180 F. 2d 357 (6th Cir. 1950). The case of Hamlin's Trust v. Commissioner,209 F. 2d 761 (10th Cir. 1954), affg. 19 T.C. 718 (1953), resulted in a general acceptance of this test. That case deduced that since the incidence of taxation depends upon the substance of the transaction, the effectiveness taxwise of the allocation to the covenant is measured by whether the parties understandingly entered into the covenant. The Tenth Circuit reasoned that if the covenant can be separated from the other assets and was realistically bargained for so *84 that the consideration is actually severable, then the consideration paid for it should be ordinary income. The newer and more acceptable of the two tests, known as the "economic reality" test, was set forth in Schulz v. Commissioner,supra at 55, as follows: the covenant must have some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement. Thus, if such an agreement has occurred freely, willingly, and knowingly, the courts are reluctant to go beyond the terms of the agreement. Levinson v. Commissioner,45 T.C. 380 (1966). However, when the covenant has no basis in fact or arguable relationship with economic reality, then no reasonable man would actually bargain for it. Regardless of which test is applied in this case, we find the following factors to be significant: 1. The parties actually contracted for a covenant not to compete, as reflected in Articles 3 and 12 of the agreement. 2. The amount allocated to the covenant appears to be reasonable both as to the total contract price and the amount *85 allocated to goodwill. 3. Petitioner entered into the agreement knowingly, voluntarily, and willingly. He testified that, prior to its execution, he read the agreement, that he understood it, that he knew it contained a covenant not to compete, and that he knew that it contained a clause allocating $20,000 of the total purchase price to the covenant. Moreover, he testified that at the time he signed the agreement he had knowledge of the legal and tax consequences of the covenant. 4. The question of allocation was discussed by the petitioner for LBW and Mr. Wolff for MVA during the course of their negotiations. Petitioner consistently and vigorously objected to any allocation to the covenant. MVA just as consistently and vigorousl insisted on its inclusion in the agreement. Obviously both parties were motivated by their own self-interests. We think the negotiations were at arm's length and conducted in good faith. To permit the petitioner to unilaterally reform the agreement in these circumstances would simply encourage parties to risk litigation after completing a transaction merely to avoid the undesirable tax consequences of their agreements. 5. MVA successfully resisted *86 petitioner's efforts to delete the allocation clause from the agreement, thus indicating the importance of the non-competition covenant to MVA. At the time of the transaction the petitioner was highly skilled and experienced in the insurance business and was only 58 years of age. And LBW was a competitor of MVA--both were general insurance agencies conducting business in the same geographic area. In addition, MVA would not have acquired the LBW business without a covenant not to compete. The main difficulty with petitioner's position in this case is that he has tried, albeit unsuccessfully, to make his evidence fit a bed of Procrustes in his effort to nullify the allocation made to the covenant. We are unwilling to isolate his somewhat self-serving testimony to the exclusion of other convincing evidence to the contrary in this record, particularly in the light of the objective facts we have considered. Petitioner relies heavily on the "severability" test, contending that the covenant not to compete was not discussed or treated as a separate item of value by the parties to the agreement. In our opinion this contention is not supported by the record. The negotiations continued *87 during the preliminary stages when the subject of the covenant and allocations of the purchase price to it were discussed. Hence the mere fact that the petitioner signed an agreement which he did not regard as entirely satisfactory from his standpoint cannot serve as a basis for finding that the allocation clause is not binding for tax purposes. With respect to this contention the cases cited by the petitioner are inapposite. Unlike the cited cases, it is clear in the instant case that there is no agreement silent on the subject of allocation of the purchase price to the non-competition covenant and no uneducated person with a lack of understanding of such covenants and their tax consequences who had never discussed the matter. In characterizing the allocation to the covenant as "artificial," the petitioner claims that the only reason for its inclusion in the agreement was the tax benefit obtainable by MVA. To be sure, MVA was interested in the allocation so that it could amortize the covenant. But there was nothing wrong with that because MVA obviously had strong economic reasons for wanting a covenant not to compete in the final agreement. In essence, there was an arguable *88 relationship with business reality. Petitioner's charges that Mr. Wolff misled him by his actions during the negotiations, even if established, would not satisfy the strong proof standard of Ullman. As we see it, there is evidence throughout the record of strenuous negotiations relating to the allocation of consideration to the covenant. The actions of Mr. Wolff in declining to state his position concerning the allocation clause without consulting his attorney is not indicative of bad faith. That Mr. Wolff chose to avail himself of counsel while the petitioner did not is certainly not evidence of overreaching. Petitioner's contention that matters would have proceeded differently if he had been represented by counsel is irrelevant in view of his conscious choice not to employ counsel. We also reject petitioner's argument that if the agreement signed by the parties had not contained a specific allocation of value to the covenant, a finding in his favor would be mandated by our opinion in Bacon v. Commissioner,T.C. Memo. 1977-52. A vital distinction between the Bacon case and this case lies in the fact that in Bacon we found that there had been no *89 bargaining as to the covenant not to compete and no express allocation of value to it. By contrast, extensive negotiations are present here and an express allocation is contained in the agreement executed by the parties. Accordingly, we hold that the $20,000 was paid by MVA for the covenant not to compete and that amount is therefore taxable to the petitioner as ordinary income. Decision will be entered for the respondent.