MARGARET KRUG, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Krug v. Commissioner
Docket Nos. 1875-78, 1963-78, 2000-78.
United States Tax Court
T.C. Memo 1981-522; 1981 Tax Ct. Memo LEXIS 220; 42 T.C.M. (CCH) 1114; T.C.M. (RIA) 81522; September 21, 1981. *220 G made an installment sale of his one-half interest in certain businesses to J for $ 600,000. The sales agreement contained a covenant by G not to compete with the businesses to which no portion of the sales price was allocated. G reported his entire gain as long-term capital gain while J's "successors in interest" amortized a portion of each payment as allocable to G's covenant not to compete. Held, no portion of the sales price is allocable to G's covenant not to compete. Lewis C. Foster, Jr. and Joe M. McAfee, for the petitioners in docket Nos. 1875-78 and 1963-78. Dudley W. Taylor, for the petitioners in docket No. 2000-78. James E. Keeton, Jr., for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Docket No.
Petitioner
Taxable Year
Amount
1875-78
Margaret Krug
1973
$ 6,253.76
1974
4,103.94
1963-78
Volunteer Asphalt
[2] 1974
7,900.03
Company
1975
7,588.54
2000-78
George C. Krug and
1973
3,177.17
Eleanor C. Krug
1974
3,292.35
The issue for our decision is what portion, if any, of the purchase price for *221 petitioner George C. Krug's interest in certain businesses is allocable to a covenant not to compete. FINDINGS OF FACT
Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner Margaret Krug was a resident of Knoxville, Tennessee when she filed her petition herein. Petitioner Margaret Krug timely filed her 1973 and 1974 Federal income tax returns. Petitoner Volunteer Asphalt Company was a Tennessee corporation with its principal place of business in Knoxville, Tennessee, at the time it filed its petition herein. Petitioner Volunteer Asphalt Company timely filed its Federal income tax returns for its fiscal years ending April 30, 1974 and April 30, 1975. Petitioners George C. and Eleanor C, Krug were residents of Blount County, Tennessee, at the time they filed their petition herein. Petitioners George C. and Fleanor C. Krug timely filed their 1973 and 1974 Federal income tax returns. Petitioner Margaret Krug (Margaret) is the widow of Julius A. Krug (Julius), who was a brother of petitoner George C. Krug (George). Volunteer Petroleum Company is an electing small business *222 corporation the stock of which is entirely owned by Margaret. The instant case is the offshoot of a protracted and bitter legal dispute between Julius and George which culminated in the 1968 sale of George's one-half interest in various enterprises to Julius for $ 600,000. The sales agreement contained George's covenant not to compete with the businesses for 15 years and within 200 miles of Knoxville. No portion of the sales price was allocated by the sales agreement to the covenant. In 1954, George and Julius formed Tennessee Associates (Associates), a partnership, to engage in the manufacture of roofing products. Prior to this time, George had been employed as a certified public accountant. From 1951 to 1954, George served as Vice President of Finance of Brookside Mills, Inc. in Knoxville, Tennessee. Prior to 1954 Julius had served as Chairman of the Board of Directors of Brookside Mills. Julius had also held several positions in government service, including a term as Secretary of the Department of the Interior in the cabinet of President Truman. Neither George nor Julius had any prior experience in the asphalt or manufacture of roofing products businesses. George and Julius *223 attempted to obtain a ready source of asphalt, the most important raw material required to manufacture asphalt roofing. Through uncuccessful discussions with several major oil companies, they learned that asphalt could not be economically delivered into the Knoxville area except by barge. The quantity of asphalt needed for the contemplated roofing business was insufficient to justify the establishment of separate river terminal or the purchase of barges, so George and Julius decided to build a river terminal for the storage of asphalt intended for highway work. In 1954 Associates formed a corporation, Volunteer Asphalt Company (Asphalt) to operate the terminal and storage area. Asphalt's 400 shares of common stock were issued to Associates. Prior to Asphalt's construction of terminal facilities, Asphalt entered into a 10-year storage contract with Shell Oil Company. Julius was in closer contact than George with the Shell officials responsible for the contract. The contract, dated August 1, 1954, required, inter alia, Asphalt to store asphalt delivered by Shell until needed for Shell's use. The contract provided Shell with options to extend the contract for two additional 5-year *224 periods. Asphalt constructed five large storage tanks for Shell's deliveries and several smaller tanks and other equipment for use in asphalt blending activities. In 1954 only two establishments, located in Nashville, Tennessee, and Chattanooga, Tennessee, could be considered competitors of Asphalt. Since that time three additional competitive operations have been established--two in Chattanooga and one in Bristol, Tenneessee. Associates also formed a second corporation in 1954, Volunteer Petroleum Company (Petroleum). Petroleum was organized for the purpose of purchasing used motor oil from service stations and reselling the oil to Asphalt for use in Asphalt's boilers and blenders. Petroleum's stock was originally owned by George (400 shares), Julius (400 shares) and F. L. Brown (400 shares). Brown's stock was purchased by Petroleum in 1957. In 1959 Shell agreed to sell fuel oil to Petroleum at a competitive price. Petroleum then leased one of Asphalt's storage tanks and began to sell fuel oil to Asphalt and to other industrial customers. Petroleum's only competition consisted of two oil companies, one in Chattanooga and the other in Spartanburg, South Carolina. In 1955 *225 Associates formed a third corporation, Volasco Product Company (Volasco) for the purpose of manufacturing and selling asphalt-based roofing products. Volasco obtained its primary material, asphalt, from Asphalt at a bargain, price. Volasco's purchases increased Ashalt's volume and net profit. Volasco also used delivery equipment owned by Petroleum in order to transport its products. Thus, the business activities of Asphalt, Petroleum, and Volasco were to a great degree integrated. Asphalt benefitted from an increased sales volume and Petroleum and Volasco benefitted from the bargain prices charged by Asphalt. Petroleum and Volasco also shared office facilities, management and supervision services, accounting services, automobiles and other overhead items. The day-to-day management of the enterprises was conducted by George. Julius resided in Washington, D.C. and travelled to Knoxville once a month to discuss business with George. Volasco quickly became a competitive factor in its market, which generally encompassed an area of 200 miles around Knoxville. Certain national roofing companies then engaged in activities within Volasco's market which Volasco considered violative *226 of Federal anti-trust laws. In 1958 Volasco filed suit in Federal District Court in Knoxville alleging anti-trust violations by the national roofing companies. George was confident of Volasco's chances of success in the suit and refrained, pending completion of the suit, from developing a full line of roofing products. George became extensively involved in trial preparation and these activities occupied most of his working day. Julius disapproved of the manner in which George was managing the various businesses and, in September 1960, proposed a dissolution of Associates on a "fifty-fifty" basis. George responded that they should wait until the end of the anti-trust trial before beginning dissolution negotiations. The trial ended in December 1960, with Volasco being awarded $ 360,000 in damages. [3] Julius was dissatisfied with the judgment because Volasco had sought $ 3 million damages and requested that George purchase his (Julius) interest in the partnership and corporations. Julius suggested $ 500,000 as the purchase price. On January 31, 1961, George wrote Julius that, while George considered $ 500,000 to be "a very high price to pay," George would attempt to "work it out." *227 [4] George enclosed a proposed option agreement for $ 500,000 for Julius' interest in Associates and the related corporations. Julius did not execute the option. In 1962 Volasco was merged into Asphalt. Volasco has been operated as a division of Asphalt since that time. George and Julius also discussed the possibility of selling the businesses to a third party. Discussions ensued with Shell regarding the possibility of a sale to Shell. In 1963, Asphalt and Shell retained the American Appraisal Company to appraise the value of the physical assets of Associates, [5]Asphalt and Volasco (now a division of Asphalt). The appraisal did not include autos, trucks, supplies, materials on hand, company records, or any current or intangible *228 assets, nor did it include any of Petroleum's assets. The appraisal found the cost of reproduction and the "sound value" of the assets to be, as of June 30, 1963, $ 1,125,721 and $ 894,245, respectively. Shell officials considered the purchase but decided against it. Julius and George continued to negotiate between themselves and in late 1964 George suggested a purchase by him of Julius' share. Julius, after meeting with counsel, offered to sell his interest to George for one-half of the value of the physical assets (determined by updating the 1963 appraisal), one-half of the excess of all other assets over liabilities and one-half of any net proceeds arising from the anti-trust suit. These negotiations also proved unfruitful. On February 23, 1965, Julius filed suit in the Chancery Court for Knox County, Tennessee, seeking the dissolution of the partnership and appointment of a receiver to continue the operations of the businesses. Pursuant to the filing of the suit, the Court appointed H. T. Kern, a Knoxville *229 attorney, as receiver. Kern proceeded to take charge of the assets of Associates, Asphalt and Petroleum. The receivorship continued until the suit was concluded in October 1968. George continued the daily operation of the business, but all major expenditures had to be approved by the court, upon application of the receiver. Negotiations with Shell continued after Julius filed the suit. On April 5, 1965, Julius offered to sell the physical assets of Associates and Asphalt, appraised as of June 30, 1963, for $ 1 million. The price of the assets not included in the June 30, 1963, appraisal was to be based on book cost. Any acceptance by Shell would have needed to be approved by the Chancery Court. On May 3, 1965, Shell rejected the offer. On May 10, 1968, during the course of litigation, Julius filed a document entitled "Petition" in which he proposed to buy George's share of the assets for $ 600,000. Julius offered to pay $ 200,000 down and $ 400,000 in installments over 15 years with 6 percent interest. Julius would also assume a long-term loan and secure the balance due of the $ 400,000 with the assets of the partnership and corporations. Julius proposed that George give *230 a "reasonable noncompetitive agreement." In the event that George did not wish to sell, Julius offered to sell his interest to George on the same basis and conditions. In his motion to strike the petition George replied that Julius' offer was merely an attempt to influence the Chancery Court's determination of the valuation of Julius' interest. During the litigation an appraiser hired jointly by George and Julius valued the businesses to be worth from $ 500,000 to $ 700,000. George's motion to strike was originally granted but, upon reconsideration, was denied by the Chancery Court. On June 12, 1968, Julius received permission from the court to withdraw his offer to purchase or sell. On June 13, 1968, Julius filed the following "Offer to Purchase": OFFER TO PURCHASE
The complainant, Julius A. Krug, makes the following offer and statement, restricted only as hereinafter stated. (1) That his evaluation of Tennessee Associates and the subsidiary corporations, namely, Volunteer Asphalt, Volasco, Volunteer Petroleum, and all other assets are worth $ 1,200,000.00, and that he, Julius A. Krug, would pay the sum of $ 600,000.00 for the interest of his defendant, George C. Krug, should *231 the Court adjudge that George C. Krug is the owner of a one-half interest in the properties, under the following conditions: Julius A. Krug would assume the indebtedness of the Third National Bank of Nashville, Tennessee, * * * and pay $ 200,000.00 in cash, and $ 400,000.00 in equal installments over a period of fifteen years, with interest at 6% and that this offer is made in contemplation that the net assets and financial structure of the corporations and partnership would remain at their approximate or general level as of this date, and would give as security for the $ 400,000.00 a mortgage on all of the assets of the partnership and the corporations * * *. George C. Krug shall give a non-competitive agreement not to enter into competiton with the partnership or the corporations for a reasonable period of time within 200 miles of Knoxville. This offer is to remain open sixty days from the date of a determination bythis Honorable Court, and if this offer is accepted, the transaction will be completed within thirty days thereafter, or in other words, the total transaction will be completed within ninety days or less. Julius A. Krug is to have possession of the properties after *232 making the initial $ 200,000.00 down payment. On that date Julius also filed the following document: MEMORANDUM
Your complainant, Julius A. Krug, in reply to the Brief of George C. Krug as to the evaluation of Tennessee Associates and the other corporations, etc., says that a true value to be placed on these companies as going businesses would be $ 1,200,000.00, and that figure would represent the stockholders' equity in the business. It is conceded that to receive this amount from the companies that there would of necessity be a payment plan which would be adequately secured by a purchaser. On June 18, 1968 and Chancery Court issued its Memorandum Opinion. The court ruled that Julius was entitled to a dissolution and liquidation of his joint business interests with George and ordered the receiver to solicit a sale of the businesses. On June 26, 1968 George filed an acceptance of Julius' offer to purchase George's interest. The acceptance provided as follows: This Honorable Court having now made its determination and rendered its Finding of Facts and Memorandum Opinion in the cause, comes now the defendant, George C. Krug, and accepts the offer of the complainant, Julius A. Krug, *233 to purchase the interest of the defendant, George C. Krug, in the partnership and the corporations for the sum of $ 600,000.00. The complainant's offer being silent as to the time of payment of the interest of the installment payments, defendant accepts the offer with the understanding that said interest payments are to be made monthly and that the periodic payments on the principal are to be made quarterly, the first such payment on the principal to be made on the 10th day of January, 1969, and the following installments each three months thereafter. This being an installment sale, if the down payment should exceed thirty percent of the sales price, defendant would be required to pay federal income tax on the entire amount of the sales price with his next income tax return, which payment would consume almost the entire amount of the down payment and would place an intolerable financial burden upon him. Defendant, therefore, will require that the down payment on the purchase price be less than thirty percent of the purchase price and, accordingly, will accept the sum of $ 175,000.00 down payment, leaving a balance to be paid in installments over a period of fifteen years of $ 425,000.00. *234 The remainder of the terms and conditions of complainant's offer to purchase appear to be free of ambiguity and are satisfactory to defendant. On August 12, 1968, Julius filed a "Withdrawal" of his offer of June 13, 1968, alleging that his original offer was for George's interest in the assets of the corporations and partnership, that George would only sell his stock in the corporations and the assets of the partnership and that George refused to put any value on the agreement not to compete. Julius alleged that his auditor offered to meet with George and George's tax advisors to work the sale out but that George refused to comply. George denied that he refused to meet with Julius and alleged that Julius refused to comply with the purchase agreement. On August 12, 1968, the court issued a decree, which directed the receiver to cease the solicitation of offers for the businesses and ordered the parties to proceed with the preparation and execution of all documents necessary to consummate and complete the sale of George's interest in the businesses to Julius. On August 13, 1968 George moved the court for an order for specific performance as folows: Comes now the Defendant, George *235 C. Krug, and moves the Court to enter an order for specific performance of the compromise agreement entered into by the parties and made the decree of this Court; that the Complainant be ordered to pay to the Defendant the agreed down payment of $ 175,000.00, together with interest at the rate of six percent (6%) per annum from July 26, 1968; and that he execute and deliver to Defendant a promissory note dated July 26, 1968, for the sum of $ 425,000.00 to be paid in installments and at the interest rate according to the terms of the compromise agreement, the payment of which to be secured by a lien upon all the assets of the partnership, Tennessee Associates, Volunteer Asphalt Company and Volunteer Petroleum Company. * * * George's motion was heard on August 23, 1968 and the court entered an order, on September 3, 1968, that Julius comply with the terms of the contract not later than September 16, 1968. The sale was not consummated by September 16, 1968 and the court issued a show cause order to Julius. On September 26, 1968 Julius petitioned the court to withdraw his offer of purchase. This "petition" contained the following: Also a valuation was to be placed on the non-competitive *236 agreement as George Krug has always run the plant and knew all of the customers, and the time period was to be worked out on the non-competitive agreement, and it is the complainant's [Julius] theory that his con-competitive [sic] agreement should continue as long as any payment of the purchase price was due to George Krug. However, the defendant has determined this to be five years by a proposed order. The Internal Revenue considers an agreement of this nature is of a taxable value. Julius also filed an answer to the court's show cause order which read, in part: Also no valuation as placed by J.A. Krug in his bid for the non-competitive agreement has been reached, and this is a very substantial part of the bid in that the Internal Revenue considers this as an asset and George Krug is the only one that has total knowledge of this business and its customers, and he is attempting to construe our ofer to suit his tax purposes, after he had depleted the book value of the stockholders' equity in an effort to buy this company at a ridiculous price, and limit the non-competitive agreement to five years. * * * George Krug expects us to assume all of the debts, all of the Federal taxes *237 and to sell only the capital stock, and to place no value on a non-competitive agreement, and there is no evidence before the Court that George Krug in any way has attempted to comply or cooperate in this offer, and there has been no meeting of the minds of the parties in this matter. J. A. Krug has submitted a proposed decree which is based on the American Appraiser's figures which were filed in this record plus additional inventory submitted by George Krug plus a value to be placed on the non-competitive agreement. We submitted a figure of $ 200,000.00 which s excessive, but it is one that we can negotiate if the defendant is willing to sit down and discuss the matter. * * * George's answer to Julius' petition to withdraw the offer of purchase read, in part: 5. It is emphatically denied that any particular valuation was to be placed on the non-competititive agreement to be given by defendant [George]. In making his offer to purchase the defendant's total business interest in the businesses for the sum of $ 600,000, the petitioner [Julius] in fact stated that the worth of the businesses themselves was $ 1,200,000. There was no break-down or proration of the purchase price in *238 any way whatever. Defendant was and is perfectly willing to make the non-competitive agreement for a period of fifteen years, which is the period over which petitioner is to make his installment payments on the balance of the purchase price. On October 7, 1968 the Chancery Court issued its decree. The decree read in part: FINAL DECREE
This cause came on for hearing on September 27, 1968, and for further and final hearing on October 7, 1968, upon the order made on the complainant, Julius, A. Krug, to show cause on or before September 27, 1968, why a decree should not be entered decreeing specific performance of the contract of purchase and sale entered into between the said Jullius A. Krug and the defendant, George C. Krug, and upon hearing the argument of counsel and it appearing to the Court that there is no proper reason why and said contrct should not be performed according to the terms and conditions as set forth in complainant's offer which was filed in this cause on June 13, 1968, the defendant's acceptance of complainant's offer which was filed in this cause on June 26, 1968, and the consent decree which was signed by both the complainant and defendant and was entered in this *239 cause as of July 2, 1968. IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED: 1. That the aforesaid contract of purchase and sale be specifically performed by the complaint, Julius A. Krug, and by the defendant, George C. Krug, as hereinafter decreed. 2. That the complainant, Julius A. Krug, pay to the defendant, George C. Krug, on or before October 15, 1968, the sum of $ 175,000.00, the agreed down payment on the purchase price. 3. That the complainant, Julius A. Krug, pay to the defendant, George C. Krug, the additional sum of $ 425,000.00, representing the balance of the purchase price, in equal periodic installments over a period of fifteen (15) years, together with interest at six percent (6%) per annum from and after October 15, 1968, on the unpaid balance thereof, said interest payments to be made monthly on the sixteenth day of each month commencing on November 16, 1968, and the periodic payments on principal to be made quarterly, the first such payment on the principal to be made on January 16, 1969, and the remaining installments to be paid each three months thereafter, all with interest as aforesaid. 4. That the entire interest of the defendant, George C, Krug, in and *240 to the partnership, Tennessee Associates, and in and to the capital stock of the corporations, Volunteer Asphalt Company and Volunteer Petroleum Company, be divested out of said defendant and vested in the complainant, * * *. The complainant assumes the balance of the indebtedness due The Third National Bank of Nashville, Tennessee, which is owed by Volunteer Asphalt Company. 5. That the Receiver in this cause be, and he hereby is, directed to surrender to the complainant, Julius A. Krug, all of the outstanding capital stock of the corporations, Volunteer Asphalt Company and Volunteer Petroleum Company, the exclusive possession and control of the premises and other assets, business and property of the said partnership and the said corporations, * * *. 6. To secure the payment by complainant to defendant of the aforesaid sum of $ 425,000.00 a lien is hereby impressed in favor of the defendant, George C. Krug, upon all of the physical plant and equipment, and any replacements therefor, owned by the partnership, Tennessee Associates, and the corporations, Volunteer Asphalt Company and Volunteer Petroleum Company; except cash, inventory and accounts receivable and all such assets *241 which it is necessary to use in the normal and usual operation of said businesses. As to all such assets neither this decree, nor the lien impressed herein, are intended to prohibit their use nor to embarrass the purchaser in his ability to use them in the normal and usual operation of said businesses. A lien is also impressed upon the real property described in Exhibit A attached hereto, and also upon the real property of Volunteer Asphalt Company as described in Exhibit B attached hereto and made a part hereof. 7. To further secure the payment by complainant to defendant of the aforesaid sum of $ 425,000.00, a lien is also hereby impressed upon the presently outstanding shares of capital stock of the corporations, Volunteer Asphalt Company and Volunteer Petroleum Company, * * *. 8. That to further secure the said defendant, so long as any balance remains due on the above mentioned sum, the complainant, Julius A. Krug, is restrained from committing waste of the assets or performing any act outside of the normal and usual operation of the businesses here involved which would result in the decreasing of the net worth of the businesses to less than their present value. The said *242 complainant is further ordered and directed to maintain the presently outstanding capital stock of the two corporations in such a manner as not to depreciate the value thereof by the issuance of any additional stock or otherwise, to a value less than its present value. 9. That the defendant, George C. Krug, shall not engage, directly or indirectly, in competition with complainant or complainant's successor or assigns in the operation of these businesses within a radius of 200 miles of the City of Knoxville, Tennessee, for a period of fifteen (15) years from the date of entry of this decree. 14. That this cause is retained on the docket and either party hath leave to apply to this Court for such executions, injunctions, or other writs or orders, as may be necessary, to carry out this decree and otherwise to compel obedience thereto. Both George and Julius appealed the Chancery Court's decree to the Court of Appeals of Tennessee, Eastern Section. Neither appeal concerned Paragraph 9 of the Chancery Court's decree. During Volasco's anti-trust litigation George developed a blood disorder that required treatment which George decided to forego until the litigation ended. George's financial *243 assets were limited and George intended, after the sale to Julius, to engage only in limited investment and financial counseling activities. In October 1968 the purchase was consummated. Julius moved from Washington, D.C. to Knoxville and undertook the management of the various businesses. Julius' son, James Krug, moved to Knoxville soon after and became involved in management of the businesses. Like his father, James had no prior experience in the asphalt business. James had no knowledge of discussions between George and Julius concerning the sale of George's interest. During the course of the litigation between George and Julius, maintenance on the equipment owned by Asphalt was sufficient to keept Asphalt in operation. No major refurbishments or improvements were made until after Julius' purchase. On March 26, 1970, Julius died. The covenant not to compete was considered an asset of the estate and included in Julius' estate tax return at a value of $ 180,000. On November 16, 1972, prior to the distributions of the assets from Julius' estate, assignments of the unamortized portion of the covenant were made to Asphalt (22.22%) and Petroleum (77.78%). In early 1970 Asphalt *244 and Petroleum retained Will J. Pugh, a certified public accountant, to determine the net worth as of October 31, 1968, of the two corporations. Pugh based his appraisal on the corporate tax returns of Asphalt and Petroleum for their fiscal years 1964 through 1968. [6] Pugh determined the average combined income adjusted to eliminate extraordinary items, and using a 10 percent capitalzation rate determined the net combined worth of Asphalt and Petroleum, as of October 31, 1968, to be $ 496,976. Pugh did not value the physical assets of Associates or the corporations and some of the records of Associates had not been recovered from the receiver. Pugh found no good will present in the businesses. On their 1974 and 1975 returns, Asphalt and Petroleum treated payments made to George as attributable to the non-competitive covenant and accordingly deducted the principal and interest due on these payments. As a result of Petroleum's election to be treated as small business corporation, the effect of these deductions was reflected on petitioner Margaret Krug's income tax returns for 1973 *245 and 1974. Petitioners George C. and Eleanor C. Krug reported amounts received from Asphalt and Petroleum as long-term capital gain on their 1973 and 1974 income tax returns. In order to ensure that the payments made to George C. and Eleanor C. Krug were treated consistently by all parties, respondent issued statutory notices of deficiency, each dated December 2, 1977, to Margaret Krug, Volunteer Asphalt Co. and George C. and Eleanor C. Krug. OPINION
The issue before us arises from the differing tax treatment accorded a non-competitive covenant by the petitioners. Respondent issued statutory notices of deficiency to all parties in order to assure that the covenant in question would be treated consistently. Thus respondent is basically a stakeholder herein and the real dispute lies among petitioners George C. and Eleanor C. Krug, the sellers, and petitioners Volunteer Asphalt Company and Margaret Krug, the purchaser's successors in interest. [7] *246 Petitioners George C. and Eleanor C. Krug initially contend that because the Chancery Court decided to allocate no portion of the $ 600,000 sales price to he covenant Asphalt and Margaret should be barred, by either res judicata or collateral estoppel, from relitigating the issue. The doctrines of res judicata and collateral estoppel are applicable in Federal tax proceedings, Commissioner v. Sunnen, 333 U.S. 591 (1948). Res judicata "applies to repetitious suits involving the same cause of action," Commissioner v. Sunnen, supra at 597. The prior cause of action was a suit by Julius for dissolution of the partnership and required a determination whether Julius was entitled, under Tennessee law, to a dissolution. The contract of sale involved herein had no bearing in Julius' right to dissolve the partnership, it merely avoided the requirement of a receiver's sale of the corporations. Res judicata is simply inapplicable in the instant case. The operation of collateral estoppel has been defined by the Supreme Court *247 in Cromwell v. County of Sac, 94 U.S. 351, 353 (1876): * * * where the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered. In all cases, therefore, where it is sought to apply the estoppel of a judgment rendered upon one cause of action to matters arising in a suit upon a different cause of action, the inquiry must always be at to the point to question actually litigated and determined in the original action, not what might have been thus litigated and determined. Only only such matters is the judgment conclusive in another action. [Emphasis supplied.] The requirement of an actual adjudication of the merits is still vital. Commissioner v. Sunnen, supra; United States v. International Building Co., 345 U.S. 502 (1953). George and Eleanor have not shown that the question of an allocation of any portion of the purchase price to the covenant was litigated in the Chancery Court. Julius' offer of June 13, 1968 was accepted by George on June 26, 1968. Julius thereafter attempted *248 to withdraw the offer, however the Chancery Court ordered the sale consummated. George then moved the Chancery Court for specific performance of the contract, the motion making no mention of the covenant. The Chancery Court ordered Julius to perform by September 16, 1968. Julius again petitioned the Chancery Court for leave to withdraw the offer, alleging, inter alia, that "a valuation was to be placed on the non-competitive agreement." Julius' answer to the Chancery Court's show of cause order stated that "no valuation as placed by [Julius] in his bid for the non-competitive agreement has been reached. " George's answer to Julius' attempted withdrawal denied that any valuation was to be placed on the covenant. The Chancery Court's final decree ordered specific performance, and included a 15-year covenant not to compete. The decree was silent regarding an allocation of the purchase price to the covenant. George and Eleanor have not introduced the records of two hearings held on the specific performance action and we do not know the importance that the covenant played therein, for a number of other issues were raised. Nor was the covenant raised on appeal. We cannot find that the *249 value of the covenant has been previously litigated and accordingly hold that collateral estoppel does not apply. [8]
When one of the parties to an agreement seeks to treat the agreement differently for tax purposes, that party must adduce "strong proof" to establish a position *250 at variance with the agreement's language. Lucas v. Commissioner, 58 T.C. 1022 (1972); Schmitz v. Commissioner, 51 T.C. 306 (1968), affd. sub. nom. Throndson v. Commissioner, 457 F.2d 1022 (9th Cir. 1972). The agreement between George and Julius contained no allocation to the convenant. Because Asphalt and Margaret seek to assign $ 200,000 to the convenant, the burden rests on them. [9]
The purchaser and seller of a business generally have adverse tax interests regarding a covenant not to compete by the seller. Amounts paid to the covenantor of a noncompetitive covenant are consideration for the covenantor's forbearance. Hamlin's Trust v. Commissioner, 209 F.2d 761 (10th Cir. 1954), affg. 19 T.C. 718 (1953); Baldarelli v. Commissioner, 61 T.C. 44 (1973), and will be taxed as ordinary income, rather than as capital gain, to the convenantor. Conversely, amounts *251 attributable to the covenant are amortizable by the covenantee under section 167[10] over the life of the covenant. Therefore, in the usual negotiations concerning a noncompete covenant, the covenantor seeks to allocate as little as possible and the covenantee as much as possible to the covenant. Unlike the standard of proof required of Margaret and Asphalt, the substantive test of what they are required to prove is less than clear. Two basic theories have evolved in this area -- the "severability theory" and the "economic reality" theory. As we recognized in Rich Hill Insurance Agency, Inc. v. Commissioner, 58 T.C. 610, 616 (1972), "the two theories often overlap if in fact they do not occasionally merge." The severability theory looks for whether the noncompete covenant can be severed from the transfer of goodwill or is merely a protective accompaniment *252 to the transfer of goodwill. Ullman v. Commissioner, 264 F.2d 305 (2nd Cir. 1959), affg. 29 T.C. 129 (1957); Michaels v. Commissioner, 12 T.C. 17 (1949). Factors tending to show severability are whether the covenant was separately bargained for, whether it was treated in a separate and distinct manner, and whether a severable consideration for the covenant can be shown, Rich Hill Insurance Agency, Inc., 58 T.C. at 617. [11]
The "economic reality" theory, as formulated by the Ninth Circuit in Schulz v. Commissioner, 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960), requires that "the covenant must have some independent basis in fact or some arguable relationship with business *253 reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." The parties' intent at the time they entered into the agreement is critical under the "economic reality" theory. See Rich Hill Insurance Agency, Inc., 58 T.C. at 617 and cases cited therein. Because appeal in these cases would lie to the Sixth Circuit, we shall consider the law applied in that circuit. Lazisky v. Commissioner, 72 T.C. 495, 502 (1979); Kinney v. Commissioner, 58 T.C. 1038, 1042 (1972); Dodson v. Commissioner, 52 T.C. 544, 555 (1969). In Montesi v. Commissioner, 340 F.2d 97, 99-100 (6th Cir. 1965), affg. 40 T.C. 511 (1963), the taxpayers argued that annual payments of $ 10,000 to each taxpayer for a 5-year noncompete convenant which was set forth in an agreement separate from the sales agreement, were really paid for goodwill. The court stated: This record demonstrates that there was arm's length bargaining; that the Montesis were capably represented and were under no economic or other pressure to accept contractual terms which placed them at an unfair position from a tax point of view; that the contracts not to compete were of significant value *254 to [the purchaser], and that the parties set a separate valuation on them. This record taken as a whole does not convince us (as it did not convince the Tax Court) that the $ 250,000 value which the parties themselves set on these contracts was unrealistic [citation omitted]. And where, as here, the parties have established the separate value of the covenants in what appears to be fair bargaining, it takes "strong proofs" to overcome the effect of their own determinations. Ullman v. Commissioner, 264 F.2d 305 (C.A.2, 1959); Hamlin's Trust v. Commissioner, 209 F.2d 761 (C.A.10, 1954); Barran v. Commissioner, 334 F.2d 58 (C.A.5, 1964). Montesi was followed in Klitzner, v. Commissioner, 358 F.2d 678 (6th Cir. 1966), affg. per curiam T.C. Memo. 1964-263; and in Bennett v. Commissioner, 450 F.2d 959 (6th Cir. 1971), affg. per curiam T.C. Memo. 1970-273. We shall thus apply the "severability theory" to the covenant in question. [12] *255 The covenant in issue was clearly set apart as a separate item in the Chancery Court's decree which is, in essence, the sales agreement. No allocation of the $ 600,000 was made to the covenant. Julius' pleadings therein allege that he was willing to set a value to the covenant, but George refused to discuss it. George, on the other hand, told the Chancery Court that no specific value had ever been offered by Julius. George also testified that Julius did not mention a value for the covenant until July 25, 1968 (one day before the closing) and George felt then that the covenant had no value. Apart from the Chancery Court pleadings, Asphalt and Margaret adduced no evidence relevant to the sales negotiations. Julius' son, James, had no knowledge of the sales negotiations. Asphalt and *256 Margaret have clearly not adduced "strong proof" to attribute a value to the covenant. Asphalt and Margaret further several reasons why we should allocate $ 200,000 to the noncompete covenant. These reasons all relate to the economic reality theory and because they constitute Asphalt and Margaret's entire argument herein will be considered. Asphalt and Margaret argue that the purchase price, $ 600,000 exceeded the physical value of the businesses' physical assets. Because the businesses had no goodwill, they continue, any such excess must have been paid for the covenant. Three separate appraisals of Asphalt and Petroleum were made. A 1963 appraisal of only the physical assets of the two companies valued them at approximately $ 900,000. Another appraisal, made sometime during the Chancery Court litigation, valued the business at $ 500,000 to $ 700,000. [13] *257 A third appraisal, made in 1970 and using a capitalization of income approach, valued the combined net worth of the corporations, as of October 1968, at about $ 500,000. This last appraisal was made without several relevant documents which had been in the receiver's possession. We find the evidence of the value of the businesses unpersuasive. Apart from the obvious shortcomings of the various appraisals, the parties themselves have taken positions 180 degrees from those taken before the Chancery Court. Julius maintained in 1968 that the true value of the businesses was $ 1,200,000 and that his $ 600,000 offer was equitable. Asphalt and Margaret, Julius' successors in interest, now argue that $ 600,000 was an excessive price and that the covenant's value was $ 200,000. Additionally, Julius' original offer to buy or sell a one-half interest was for $ 600,000 regardless of whether Julius' interest was to be sold or George's interest was to be sold. This tends strongly to show that Julius did not value George's noncompete covenant at the time the original offer was made. Furthermore, Julius' answer to the Chancery Court's show cause order stated, "We submitted a figure of $ 200,000 [for *258 the covenant] with is excessive, but it is one that we can negotiate if the defendant [George] is willing to sit down and discuss the matter." [14]
George, on the other hand, now argues that Julius paid a full and fair price for George's interest and thus the covenant was without value. However, George maintained before the Chancery Court that Julius' $ 600,000 offer was an overstatement of the value of either one-half interest and was merely intended to bias the Chancery Court towards placing a higher valuation on Julius' interest. George adhered to this position throughout the Chancery Court's proceedings. Asphalt and Margaret argue that the covenant was valuable because of Julius' and his son's inexperience, the deterioration of the businesses' physical plant during the litigation, the expiration in September 1969 of Shell's first 5-year option with Asphalt and George's ability to compete with Asphalt and Petroleum. While the new management of the corporations was relatively inexperienced, without the possibility of competition from George their inexperience *259 would not be a factor in valuing the covenant. After all, the economic reality theory is primarily concerned with business realities which would cause "reasonable men, genuinely concerned with their economic future" to bargain for the covenant, Schulz v. Commissioner, supra at 55. The record shows that George had been ill before the sale, did not have the financial capability to compete with the corporations, and intended to only do a minimal amount of work thereafter as a business consultant and accountant. While the covenantor's business abilities have been considered relevant, Kinney v. Commissioner, supra, we believe that the likelihood of competition from George was insufficient to justify an allocation to the covenant. See Baldarelli v. Commissioner, supra at 51. The record is also uncertain as to the deterioration of the facilities during litigation, although $ 200,000 to $ 300,000 was spent by the new management for improvement and repairs. Lastly, while the Shell agreement with Asphalt would expire within one year of the sale, Julius, according to George's testimony, had always been in closer contact than George with the Shell officials responsible for renewing the agreement. *260 Lastly, Asphalt and Margaret argue that the instant case differs from the ordinary "arm's length" bargaining situation because the sales agreement was made through court proceedings. Thus, they continue, there was never a "meeting of the minds" regarding the covenant and we should therefor set the covenant's true value. While there appear to be no cases directly on point, we do not feel that the unusual negotiating history of the agreement should change the result herein. Julius voluntarily put forth two offers during the litigation. Julius was ably represented by counsel and tax advisors and was certainly not at a negotiating disadvantage with George. While the sales agreement was actually the Chancery Court's decree for specific performance, we see no difference than if the negotiations had taken place entirely outside of court and George had then brought suit for specific performance. Julius' offer simply chose not to allocate any portion of the price to the covenant. The instant case is close factually to Baldarelli v. Commissioner, supra.In Baldarelli a 60-percent partner purchased the entire partnership interest of a 20-percent partner for $ 45,000. The sales agreement *261 contained a noncompete covenant from the selling partner to which no amount was assigned. In refusing to allocate any portion of the purchase price to the covenant we stated, 61 T.C. at 52: Here we have the situation where a selling partner seeks to withdraw from the partnership * * *; where the contract of sale contains a covenant not to compete * * *; and where no value is assigned the covenant * * *. In this type of factual dispute no single factor is determinative. But where, as here, taxwise parties do not put a value on a covenant not to compete, we are hesitant about assigning a value to it absent a strong showing as to what its value might be. See Reuben H. Donnelley Corp. v. United States, 257 F. Supp. 747, 756-758 (S.D. N.Y. 1966), for a discussion of the difficulty a party will encounter when he seeks to have a court value a covenant not to compete not specifically valued in the agreement. See also Balthrope v. Commissioner, 356 F.2d 28, 34 (C.A. 5, 1966), where the Court of Appeals said: No one has to arrange his business affairs to satisfy the tax collector's appetite for revenues. But when a taxpayer has failed to arrange his affairs so as to minimize his taxes, *262 he cannot expect the Court to do it for him nuncprotunc. * * * Under the instant circumstances, we decline to allocate any amount to the noncompetitive covenant. Decision will be entered for respondent in docket No. 1875-78. Decision will be entered for respondent in docket No. 1963-78. Decision will be entered for petitioners in docket No. 2000-78. Footnotes
1. Cases of the following petitioners are consolidated herewith: Volunteer Asphalt Company, docket No. 1963-78; George C. Krug and Eleanor C. Krug, docket No. 2000-78.↩
2. Petitioner Volunteer Asphalt Company reports on the basis of a fiscal year ending April 30.↩
3. This judgment was later reversed by the United States Court of Appeals for the Sixth Circuit. Volasco eventually recovered around $ 150,000 in anti-trust damages, attorneys fees and interest. ↩
4. Julius apparently reached the proposed $ 500,000 sales price from preliminary discussions George had had with a prospective purchaser in 1958. George had stated at that time that $ 1 million would probably be needed to purchase the business operations owned by the Krugs.↩
5. Associates, at that time, also operated a marina, which sold and serviced boats, boat accessories and rented dock space. The marina was destroyed by a tornado in 1965.↩
6. Petroleum reports on the basis of a fisal year ended October 31. Asphalt, April 30. See footnote 2.↩
7. The term "successors in interest" is used roughly here. Asphalt and Petroleum are Julius Krug's successors in interest in the covenant. Because Petroleum was an electing small business corporation for the years in issue, any deductions taken by Petroleum for payments on the covenant were reflected on Margaret Krug's individual return. Thus Margaret Krug shall be considered a successor in interest herein.
8. George and Eleanor also argue that State law which determines the rights of the parties should be applied in Federal tax proceedings, citing Lyeth v. Hoey, 305 U.S. 188 (1938). We have decided above that the State court did not determine the value of the covenant. State law is only controlling in Federal tax proceedings "when the federal taxing act by express language or necessary implication makes its operation dependent upon state law," Lyeth v. Hoey, supra at 194. Sections 167 and 1221, involved herein, are not dependent upon Tennessee law. Even had the Chancery Court valued the covenant under Tennessee law, we need only accord that decision "proper regard" in making our determination herein. Commissioner v. Estate of Bosch, 387 U.S. 456 (1967). We need not decide whether the parties to each action are identical, as is required for collateral estoppel to apply, due to the presence of respondent herein.↩
9. Because respondent's determination is presumed correct, conveivably all the petitioners herein could fail to carry their burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure.↩ However, the parties, including respondent, have provided stipulations to avoid that possibility depending upon our decision herein.
10. Section 167(a) allows a deduction for exhaustion, wear and tear and obsolescence of property used in the trade or business or of property held for the production of income. Section 167 (b) provides allowable methods and rates which, for intangible property, are limited by section 167(c) to the "straight line method," i.e↩., amortization.
11. In Rich Hill Insurance Agency, Inc. v. Commissioner, 58 T.C. 610, 617, note 3 (1972), we noted: The severable-nonseverable distinction haf fallen into some disfavor because every covenant not to compete is nonseverable from goodwill in the sense that each such covenant is executed in order to protect goodwill. E.g., Balthrope v. Commissioner, 356 F.2d 28, 31 (C.A. 5, 1966), affirming a Memorandum Opinion of this Court; Schulz v. Commissioner, 294 F.2d 52, 55-56 (C.A.9, 1961), affirming 34 T.C. 235↩ (1960).
12. Klitzner v. Commissioner, T.C. Memo. 1964-263 was decided before the Sixth Circuit's opinion in Montesi and utilized the severability theory. Bennett v. Commissioner, T.C. Memo. 1970-273, was decided after the Sixth Circuit's decision in Montesi and Klitznerand also used the severability theory. Although our opinion in Bennett included discussion of the economic reality theory, 29 T.C.M. at 1235, 39 P-H Memo. par. 70, 273 at p. 70-1345, the Sixith Circuit's per curiam opinion in Bennett addresses severability. While some language in Montesi↩ may imply an economic standard, we find that the applicable theory in the Sixth Circuit is the severability theory.
13. This appraisal was not introduced herein, but was alleged in a petition to the Chancery Court by George, dated May 8, 1969, which also alleged that the value of the businesses was insufficient to secure Julius' debt. Although George's petition was introduced into evidence herein, the basis of this appraisal is unclear.
14. Julius' estate valued the covenant at $ 180,000. We do not know who provided the estate tax valuation nor how it was arrived at.↩