T.C. Memo. 1997-120


UNITED STATES TAX COURT


PHILLIP M. WELCH AND DOROTHY ELLEN WELCH, Petitioners
<u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 26800-92.          Filed March 10, 1997.


<u>Joseph Granberry Shannonhouse IV</u>, for petitioners.

<u>Edith Moates</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, <u>Judge</u>:  Respondent determined the following

tax deficiencies, additions, and penalties with respect to

petitioners' joint 1989 income tax and Mr. Welch's separate

1990 income tax:

| Year | Deficiency | Additions to Tax and Penalties | |
| | | Sec. 6651(a)(1) | Sec. 6662(a) |
| 1989 | $11,196 | $3,832 | $2,239 |
| 1990 | 13,588 | 6,407 | 2,718 |

All section references are to the Internal Revenue Code of 1986 as amended and in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. References to petitioner are to Phillip M. Welch.

After concessions, the issues for decision are: (1) Whether petitioners are entitled to deduct payments made pursuant to an agreement between petitioner and Mr. A.C. Rahill, under which Mr. Rahill transferred his accounting practice to petitioner, on the theory that the payments represent the amortized cost of a covenant not to compete or a client list; and (2) whether petitioner is liable for the accuracy-related penalty determined by respondent pursuant to section 6662(a).

FINDINGS OF FACT

At the time petitioners filed the instant petition, they resided in Oklahoma City, Oklahoma. Petitioners were husband and wife during 1989 and filed a joint Federal income tax return for that year. They separated during 1990, and petitioner filed a separate return for that year. Petitioners used the cash receipts and disbursements method of accounting to report income and expenses on both returns.

Petitioner has practiced accounting since 1974 and has been licensed as a certified public accountant since 1982. After graduating from college, petitioner was employed by Mr. A.C. Rahill, a public accountant, from 1974 through 1981. From 1982 through 1987, petitioner was employed by an oil company, and he performed bookkeeping services for other clients. In 1987, petitioner entered into the agreement with Mr. A.C. Rahill that is in issue in this case, and he began his own accounting practice. During the years in issue, he engaged in his own accounting practice.

Prior to 1987, Mr. A.C. Rahill practiced public accounting in the Oklahoma City area. Mr. Rahill's clients consisted of individuals and closely held corporations. He had been retained by some clients to provide accounting services for as long as 20 years.

Shortly before the subject agreement was executed, the Criminal Investigation Division of the Internal Revenue Service seized the records of 55 of Mr. Rahill's clients. In general, the records that were seized included copies of Federal income tax returns, ledgers and journals, profit and loss statements, records of inventory, records of accounts payable and receivable, computer storage media and printouts, and papers used in the preparation of various tax returns. Shortly after Mr. Rahill's death, in October

or November of 1987, the Criminal Investigation Division returned the seized records to petitioner.

Sometime before Mr. Rahill agreed to transfer his accounting practice to petitioner, it was discovered that he had an abdominal aortic aneurysm. Mr. Rahill disclosed his condition to petitioner. The agreement describes Mr. Rahill's medical condition as follows:

> 8. <u>Contingency and Effective Date.</u> Rahill has disclosed, and Welch [petitioner] is aware, of severe and life threatening health problems which are imminent. * * *

On October 30, 1987, shortly before Mr. Rahill underwent surgery to correct the aneurysm, his physician, Scott K. Lucas, M.D., wrote the following letter to Mr. Rahill's attorney, Dennis Roberts:

> Dear Mr. Roberts:
>
> This letter is in response to your request regarding Mr. A.C. Rahill's condition and prognosis. As you know he has been diagnosed with a six centimeter in diameter abdominal aortic aneurysm. The aneurysm itself is asymptomatic thus far, but it is of such a large size that operative repair is indicated to prevent the life threatening condition of rupture of the aneurysm. The size of the aneurysm makes its presence a life threaten- ing condition and elective operation is scheduled for later next week. The operation will entail removing the aneurysm and replacing a segment of the abdominal aorta with a Dacron graft. The risk is approximately in the five percent range with approximately one percent risk of mortality. Mr. Rahill's risk is somewhat higher than normal regarding infection because of the previously placed colostomy and his recent infection of the epididymis.
>
> As we discussed, I think that stress is to be avoided prior to the operation because of possible elevations in

> blood pressure causing leakage or rupture of the aneurysm.
> His recovery time will entail approximately ten days to
> two weeks in the hospital and approximately six weeks
> further recovery at home.
>
> I hope that this letter answers your questions.
>
> Please feel free to contact me if you desire further
> information.
>
> Sincerely,
>
>
> Scott K. Lucas, M.D.
> SKL:bp

The surgery described by Dr. Lucas took place several days later.  Mr. Rahill died during the operation.  Mr. Rahill was 65 years of age at the time of his death.

Before September 18, 1987, an accountant who was working for Mr. Rahill resigned to take a different job. Mr. Rahill approached petitioner and proposed that they share office space.  Mr. Rahill suggested that petitioner continue to practice accounting under his own name but help manage Mr. Rahill's accounting business.  Petitioner and Mr. Rahill did not reach agreement on this proposal.

On September 18, 1987, Mr. Rahill and petitioner entered into the subject agreement under which petitioner agreed to assume Mr. Rahill's accounting practice. Petitioner also agreed to pay 25 percent of the gross revenues earned from the 206 clients listed on a schedule attached to the agreement for a 48-month period.  The

agreement was drafted by Mr. Rahill's attorney, Mr. Dennis

Roberts.  The agreement provides as follows:

2.  Transfer of Accounts.  As of the effective
date of the Agreement, Welch agrees to assume the
accounting practice of Rahill.  The parties agree
that this practice is represented by the clients
contained in the list attached hereto as
"Schedule A".  Welch agrees to pay Rahill one
hundred percent (100%) of the average annual
gross revenues earned from the clients set out in
Schedule A.  The average annual gross revenues
being determined by actual revenues for a forty-
eight (48) month period, beginning with the
effective date of the agreement.  The amount paid
under this Agreement will be in consideration for
Rahill's cooperation and "Covenant Not to
Compete".  Future payments will be 25% of the
monthly receipts, payable on the tenth of each
month for a period of four years.  The final
payment will be due on the tenth day of the
forty-ninth month following the effective date of
the agreement. This final payment will equal one
hundred percent (100%) of gross revenues earned,
whether billed and collected or not, less the sum
of all payments previously made, during the
forty-eight (48) month period of this Agreement.

For the purposes of payments required by
this Paragraph, the term "Clients" shall also
include any new business entities or enterprises
entered into by present clients listed on
Schedule A, but only if such new business or
enterprise is owned by fifty-one percent (51%) or
more, or is controlled by the present clients or
client's spouse or children.  Also, if any client
listed on Schedule A ceases to be a client during
the term of this agreement, and later becomes a
client again, such client's billing shall be
included for purposes of computing the payments
due under this Paragraph.

Rahill shall transfer all his client files,
work papers, and other like items necessary for
an accounting firm to handle its clients, to
Welch.  Such assignment shall not include any
accounts receivable billed or unbilled, and
also not included in the assignment are any
liabilities existing or contingent of Rahill.

As provided above, Mr. Rahill was to transfer all of his client records and work papers to petitioner, and petitioner assumed no liabilities and received no rights to any of Mr. Rahill's accounts receivable.

There is attached to the agreement a list of the 206 clients who made up Mr. Rahill's accounting practice. The agreement calls for Mr. Rahill to refrain from soliciting the business of or otherwise performing services for any of the listed clients for a period of 4 years, unless expressly requested by petitioner. The agreement provides as follows:

> 4. <u>Covenant Not to Compete</u>  Rahill agrees that, from and after the date of this Agreement for a period of four (4) years, he will not (unless acting upon a request of Welch), directly or indirectly, solicit business from the existing clients listed on Schedule A or perform directly or indirectly any service for any of the existing clients listed on Schedule A of a nature which could have been rendered by Welch.

The agreement makes no provision for the abatement or termination of the payments to Mr. Rahill or his assigns in the event of Mr. Rahill's death or disability. The agreement contains Mr. Rahill's representation and warranty that the payments received under the agreement are for his covenant not to compete and that the payments would be reported for Federal income tax purposes as "ordinary income." The agreement states as follows:

> Rahill agrees that the payments to be
> received under paragraph (2) of this
> Agreement are payments for his Covenant
> Not to Compete and agrees that he will
> report the payments for the Covenant
> Not to Compete as "ordinary income" for
> the purposes of federal income tax
> reporting.

The agreement and the rights prescribed thereunder were expressly made nonassignable by petitioner.  However, the agreement provided that Mr. Rahill contemplated assignment of his rights under the agreement and that petitioner approved of the assignment.  After entering into the agreement, Mr. Rahill assigned his right to receive the payments under the agreement to the A.C. Rahill Irrevocable Family Trust (family trust).  The record does not reveal the terms of the family trust.  Petitioner made all of his payments under the agreement to the family trust. Petitioner prepared the family trust's income tax returns.

Petitioner paid the following amounts to Mr. Rahill's family trust under the agreement:

| Tax Year | Amount Paid |
|----------|-------------|
| 1987 | $7,607 |
| 1988 | 40,680 |
| 1989 | 39,519 |
| 1990 | 41,900 |
| 1991 | 31,519 |
| Total | 161,225 |

The agreement requires Mr. Rahill to assist petitioner in the transfer of the client accounts.  The agreement provides as follows:

> 3.  <u>Assistance in Transfer of Accounts</u>  Rahill does hereby agree to assist Welch [petitioner] as reasonably needed subsequent to the effective date of this Agreement in order to assure an orderly and efficient transfer of accounts to Welch.  Rahill will use his best efforts to facilitate the transfer to prevent loss to Welch.
> In return for the above consideration, Rahill will be committed to spend 40 hours maximum, to aid in the orderly transfer of accounts to Welch. Any time required over and above the forty (40) hours per month Welch will pay Rahill at a mutually agreed rate per hour.

The agreement did not require petitioner to retain any of the persons employed by Mr. Rahill.  At the time of the agreement, Mr. Rahill employed Ms. Mary Ann Martin and Ms. Cathy Rahill, who is Mr. Rahill's daughter.  After entering into the agreement, petitioner hired both of these persons and two additional employees:  Ms. Janet Ramsey, an accountant, and Mrs. Dorothy Ellen Welch, petitioner's wife at the time, who performed bookkeeping tasks.  It appears from the record that all of these employees worked for petitioner during both of the years in issue.

After the agreement was executed, petitioner leased Mr. Rahill's office at 2809 Northwest Expressway directly from the landlord.  After moving, petitioner remodeled

Mr. Rahill's former offices and expanded them by approximately 500 square feet.

In a separate agreement, petitioner leased all of the equipment and furniture that Mr. Rahill had used in his practice, including a large computer, a small computer, desks, and various and sundry other office equipment. The lease required petitioner to pay $500 per month to Mr. Rahill for a term of 4 years.

At the end of each of the 5 years following the agreement, the number of listed clients who no longer retained petitioner, the percentage that that number represents of 206, and the revenues received from the remaining clients expressed as a percentage of the gross receipts realized by Mr. Rahill in the year prior to the sale, $267,664.20, are as follows:

| Period | Number of Listed Clients Lost | Percentage Lost | Revenue from Remaining Listed Clients as a Percent of Gross Receipts in the Year Prior to Sale |
|---|---|---|---|
| 9/87--8/88 | 65 | 31.55 | 51.9 |
| 9/88--8/89 | 21 | 10.19 | 59.6 |
| 9/89--8/90 | 10 | 4.85 | 61.4 |
| 9/90--8/91 | 7 | 3.40 | 68.0 |
| 9/91--8/92 | 2 | .97 | |
| | 105 | 50.96 | |

During the years listed above, petitioner did not provide services to the listed clients that were materially different from the services Mr. Rahill had provided, and petitioner did not raise his fees.

On the Schedule C for petitioner's accounting business that is attached to petitioners' joint 1989 Federal income tax return, petitioners deducted $39,519 labeled "COVENANT NOT TO COMPETE". Similarly, on the Schedule C for petitioner's accounting practice that is attached to his separate return for 1990, petitioner deducted $41,900 labeled "COVENANT NOT TO COMPETE".

Respondent issued a notice of deficiency to petitioners pertaining to their joint 1989 tax return and issued a notice of deficiency to petitioner for his 1990 tax return. In each notice, respondent disallowed the deduction labeled "COVENANT NOT TO COMPETE". The notice of deficiency issued to petitioners for 1989 explains respondent's determination as follows:

> The $39,519 deducted for amortization of a covenant not to compete is not allowed because any value of the covenant not to compete, included in your contract of purchase with A.C. Rahill dated September 18, 1987, is inseparable from the total purchase price. Accordingly, your 1989 taxable income is increased $39,519.

Except for the amount of the deduction, respondent's explanation in the 1990 notice of deficiency is identical to that quoted above.

OPINION

Petitioner agreed to "assume" the seller's accounting practice, which was composed of 206 enumerated clients, and to pay the seller 25 percent of the monthly receipts from those clients during a 48-month period. In a separate agreement, petitioner leased the seller's office equipment for a term of 4 years and agreed to pay $500 per month. Petitioner also took over the seller's office by leasing it directly from the landlord, and he hired the seller's employees.

Petitioners claim to be entitled to deduct the monthly payments that petitioner made to the seller during 1989 and 1990 in the amounts of $39,519 and $41,900, respectively. Petitioners claim that the deductions are proper under section 167(a)(1) on the ground that they represent the amortized cost either of the seller's covenant not to compete contained in the agreement or, alternatively, the amortized cost of the seller's client list. Petitioners' preferred theory is that the subject payments were made in consideration of the covenant not to compete, the useful life of which is established by the term of the agreement, 48 months. Petitioners argue in the alternative that the

payments are entirely allocable to the seller's client list and that the client list has a useful life in petitioner's business of 4 or 5 years.  Petitioners introduced expert testimony in support of their position that the useful life of the client list is 4 or 5 years.

Respondent's position is that the covenant not to compete lacked economic reality in view of the seller's age and "imminent, severe and life threatening health problems" that led to his death "on the operating table within 90 days of the agreement."  As to petitioners' position that the payments are deductible as the amortized cost of the seller's client list, respondent introduced the testimony of an expert witness to establish that no more than 90 percent of petitioner's payments to the seller are allocable to the client list and that the useful life of the client list was no less than 15 years.

Generally, section 167(a) allows as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear of property used in a trade or business or held for the production of income.  Section 1.167(a)-3, Income Tax Regs., extends the depreciation deduction to intangible assets which are used in the trade or business for only a limited period of time, the length of which can be determined with reasonable accuracy.  The above regulation states as follows:

Intangibles. If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill * * *

Thus, generally, if an intangible asset is shown to have an ascertainable value and a limited useful life which can be determined with reasonable accuracy, the depreciation allowance may be utilized. The "significant question for purposes of depreciation is * * * whether the asset is capable of being valued and whether that value diminishes over time." Newark Morning Ledger Co. v. United States, 507 U.S. 546, 566 (1993). Covenants not to compete and client lists may constitute amortizable intangible assets. See id.; Balthrope v. Commissioner, 356 F.2d 28, 31 (5th Cir. 1966); O'Dell & Co. v. Commissioner, 61 T.C. 461, 466 (1974); Wager v. Commissioner, 52 T.C. 416, 419 (1969); Levinson v. Commissioner, 45 T.C. 380, 389 (1966). In passing, we note that for intangibles acquired after August 10, 1993, section 197 allows a taxpayer to amortize the adjusted basis of the intangibles ratably over a 15-

year period.  Revenue Reconciliation Act of 1993, Pub. L. 103-66, sec. 13261(a), 107 Stat. 312, 533.

## Covenant Not To Compete

In this case, the seller was 65 years of age at the time he entered into the subject agreement with petitioner. He was not only suffering from the abdominal aortic aneurysm that led to his death, but he also had other health problems, including a colostomy and an infection of the epididymis.  The seller's actions are consistent with the actions of a person who intended to permanently retire due to age and health problems.  Nothing in the record suggests otherwise.  In fact, the agreement makes express reference to the fact that the seller had "severe and life threatening health problems which are imminent", it fails to provide that petitioner's payments would cease in the event of the seller's death or inability to practice accounting, and it makes reference to the fact that the seller planned to assign the payments to a family trust.

Petitioners attempt to minimize the severity of the seller's health problems.  They argue that the surgery to correct the seller's aortic aneurysm "was elective and not mandatory" and they point out that a letter written by the seller's physician states that the risk of death from the operation was 1 percent.  However, we are not persuaded by

petitioners' argument on this point, and we note that they

did not call the seller's physician as a witness in this

case.

Petitioners also argue as follows:

> Further, where the tax positions of the parties
> to a contractual transaction are antithetical,
> courts have been loath to look behind the
> contract. Hamlin's Trust v. Comm., 54-1 U.S.T.C.
> ¶9215, 209 F.2d 761 (10th Cir. 1954). This is
> due in no small measure to the fact that the
> presumed tax consequences likely effect (sic) the
> economic bargain between the parties. In Joan C.
> Clesceri v. United States, 79-2 U.S.T.C. ¶9738
> (U.S.D.C. No. Dist. Ill. 1979), an allocation to
> a covenant not to complete (sic) in an agreement
> for the sale of a refuse business was held to be
> binding for tax purposes even when the selling
> party was aware he was terminally ill when the
> contract was entered into.

The cases cited by petitioners are not applicable to this

case. In both of those cases, the taxpayers, rather than

the Commissioner, sought to vary the terms of an agreement.

In each case, the taxpayer reported the proceeds of the

sale of stock or the sale of business assets as allocable

entirely to the stock or to the assets, contrary to an

agreement with the buyer under which a portion of the

proceeds was allocated to a covenant not to compete.

Hamlin's Trust v. Commissioner, 209 F.2d 761, 762-763

(10th Cir. 1954), affg. 19 T.C. 718 (1953); Clesceri v.

United States, 45 AFTR 2d 80-634, 79-2 USTC par. 9738 (N.D.

Ill. 1979). In each case, the court held the taxpayer to

the agreement on the ground that the taxpayer had failed to introduce sufficient justification to be relieved of its terms.  In Hamlin's Trust v. Commissioner, supra at 765, the court states as follows:

> While acting at arm's length and understandingly, the taxpayers agreed without condition or qualification that the money received should be on the basis of $150 per share for the stock and $50 per share for the agreement not to compete.  Having thus agreed, the taxpayers are not at liberty to say that such was not the substance and reality of the transaction.  [Citations omitted.]

In Clesceri v. United States, 45 AFTR 2d 80-634, at 80-638, 79-2 USTC par. 9738, at 88,739, the court stated as follows:

> In summary, we hold that, where the parties to a sales agreement have assigned a value to a covenant, strong proof must be adduced for either of them to overcome or modify the allocation.  We further hold that evidence indicating that the covenant lacks economic reality is not "strong proof" justifying disregarding the parties' allocation.  * * *

For other cases in which the taxpayers sought to vary the terms of a contractual allocation, see generally Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), vacating 44 T.C. 549 (1965); Ullman v. Commissioner, 264 F.2d 305 (2d Cir. 1959), affg. 29 T.C. 129 (1957).

Contrary to the implication of petitioners' argument, neither the Commissioner nor this Court is bound to accept

a contractual allocation to a covenant not to compete. See, e.g., <u>Schulz v. Commissioner</u>, 294 F.2d 52, 56 (9th Cir. 1961), affg. 34 T.C. 235 (1960); <u>Landry v. Commissioner</u>, 86 T.C. 1284, 1307 (1986). The economic reality of a transaction, rather than the form in which it is cast, governs for Federal income tax purposes. <u>Hamlin's Trust v. Commissioner</u>, <u>supra</u> at 764; <u>Landry v. Commissioner</u>, <u>supra</u>. In order for a contractual allocation to be upheld, it must be shown to have some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement. <u>Schulz v. Commissioner</u>, <u>supra</u>. In this case, respondent determined that the realities of the transaction are different from the form in which the seller and petitioner clothed the transaction. <u>Id.</u> Respondent determined that the payments purportedly for the seller's covenant not to compete were "inseparable from the total purchase price" and disallowed the deduction.

We find that petitioners have not met their burden of proving that the covenant not to compete had economic reality. See Rule 142(a). In view of the seller's age and health problems, and the other facts and circumstances of this case, we are not persuaded that petitioners have proven that the covenant had any independent basis in fact

or arguable relationship with business reality such that reasonable persons, genuinely concerned with their economic futures, might bargain for it.  See Schulz v. Commissioner, supra at 55; O'Dell & Co. v. Commissioner, 61 T.C. 461, 468 (1974); Rich Hill Ins. Agency, Inc. v. Commissioner, 58 T.C. 610, 619 (1972); McKinney v. Commissioner, T.C. Memo. 1978-448.

Client List

Petitioners' alternative argument is that the entire amount paid to the seller, $161,225, must be allocated to the client list acquired under the agreement.  They further argue that the client list had a useful life in petitioner's business of 4 or 5 years.  Petitioners submitted the expert report and testimony of Dr. James Alexander in support of their argument that the useful life of the client list was 4 or 5 years.  We note that Dr. Alexander was not asked to place a value on the client list.  Rather, petitioners argue that no part of the amount paid can be allocated to goodwill or the going concern value of the business with the result that the value of the client list must equal the amount paid by petitioner.

Dr. Alexander based his opinion that the useful life of the client list was 4 to 5 years on the cumulative effect of four actuarial factors that could be expected to

cause a client to leave petitioner for another accountant. The factors used by Dr. Alexander are: Death, relocation, retirement, and client turnover. Dr. Alexander concluded that the average death rate was 5.3 percent, the average relocation or migration rate was 5.4 percent, the average retirement rate was 7.5 percent, and the average turnover rate was 5.0 percent. He concluded that the sum of these percentages, 23.2 percent, would be the rate at which petitioner could expect to lose clients from the list, resulting in a useful life of 4 to 5 years. We review Dr. Alexander's computation of each of these factors below.

Death Rate: Dr. Alexander grouped 164 of the 206 listed clients into groups in accordance with their life expectancy. He determined the life expectancy of the clients using the actuarial tables in IRS Publication 575. He used only actuarial rates for males. He grouped the clients into 5-year "cohorts"; i.e., clients with a life expectancy of 0 to 5 years, 5 to 10 years, 10 to 15 years, 15 to 20 years, etc.

Dr. Alexander divided the number of individuals in each cohort by the life expectancy of that cohort to arrive at an expected annual number of deaths for that cohort. He then added the annual deaths for each cohort to arrive at an expected annual number of deaths among the listed clients of 8.512 deaths per year. Based thereon,

Dr. Alexander concluded that the death rate for the persons on the client list was 5.32 percent.  It appears that Dr. Alexander reached this result by dividing the expected annual client deaths per year, 8.512, by 160 rather than by 164.  Dr. Alexander's computation is as follows:

<u>Expected Mortality</u>

| Cohort (life expectancy) | 45 | 40 | 35 | 30 | 25 | 20 | 15 | 10 | 5 | 0 |
|---|---|---|---|---|---|---|---|---|---|---|
| Clients | 2 | 11 | 23 | 23 | 9 | 7 | 59 | 21 | 9 | 0 |
| Deaths | .04 | .26 | .61 | .71 | .33 | .31 | 3.37 | 1.68 | 1.2 | .00 |

| | |
|---|---|
| Annual deaths | 8.512 |
| Death rate | 5.32 |

Relocation Rate:  Dr. Alexander computed a relocation factor based upon unpublished data from the Internal Revenue Service entitled "Yearly County to County Migration Flows" that shows the number of "out migrants" from Oklahoma County for the 10-year period, 1980 to 1990.  He found that the average number of persons leaving Oklahoma County during that period was 5.35 percent of the average population.  He rounded this percentage to 5.4 percent.

One assumption underlying Dr. Alexander's analysis is that all of the listed clients are located in Oklahoma County.  We cannot verify that assumption from the record

in this case.  Another assumption is that any client who moves out of Oklahoma County will seek another accountant. That assumption ignores the fact that the Oklahoma City metropolitan area spans several counties and that a number of other counties are in relatively close proximity to Oklahoma County.  Contrary to Dr. Alexander's assumption, it is not apparent that a client who moves to a nearby county or even to another State will necessarily change accountants.

Retirement:  Dr. Alexander also considered the effect of retirement on the useful life of the subject client list.  He analyzed data provided by petitioner showing the fees paid by, and the age of, each client.  He noted "a dramatic drop-off in fee income per client beginning at age 70."  Dr. Alexander concluded that this decrease is due to "the client's having moved into the retirement phase * * * and thereby requiring less fee-based accounting services." His report states as follows:  "Based on our calculations, we estimate * * * a loss of approximately 7.5 percent in fee income per year due to retirement."  Dr. Alexander did not include his calculations in his report.

We agree with Dr. Alexander that his chart of the average fee versus age distribution of clients on the subject list suggests that the fees paid by clients who are older than 70 years of age are substantially less than

those paid by younger clients, especially those between the ages of 55 and 70.  We might also agree that this correlation should be taken into account in valuing the subject list.  However, we are not sure what this correlation has to do with the useful life of the list. As suggested by Dr. Alexander, a client who retires still has a need for an accountant; it is just not as great a need.  In fact, the chart of average fee versus age distribution in Dr. Alexander's report shows that fees were paid by clients in the three oldest age groups, 70 to 75 years, 75 to 80 years, and 80 to 85 years.

Client Turnover:  Dr. Alexander states that "Despite an accountant's best efforts to maintain client relation-ships, and often due to factors completely outside the accountant-client relationship, a certain number of clients can be expected to drift away to other firms". Dr. Alexander considered the effect of this client turnover on the useful life of the client list.  He based his analysis on the opinion of Mr. Albert S. Williams in his manual, "On Your Own! How to Start Your Own CPA Firm". According to Dr. Alexander, Mr. Williams "writes, 'Typically, the number of terminating clients ranges between 5 to 10 percent of a given practice' (p. 35)." Dr. Alexander chose 5 percent as a client turnover rate. Dr. Alexander did not explain why the use of this annual

client turnover factor does not overlap the effect of death, retirement, and relocation.

Respondent introduced the expert report and testimony of Mr. Paul Meade. In summary, Mr. Meade concluded that the amount paid by petitioner for the seller's accounting practice should be allocated as follows:

| | |
|---|---|
| Going concern | $16,000 |
| Goodwill | -- |
| Client list | 145,225 |
| Non-compete covenant | -- |
| Total | 161,225 |

As depicted above, Mr. Meade concluded that approximately 10 percent of the amount paid by petitioner, $16,000, must be allocated to going-concern value and the remainder, $145,225, must be allocated to the client list. Mr. Meade also concluded that the useful life of the client list in petitioner's accounting business is at least 15 years.

Mr. Meade used an income analysis in order to compute the useful life of the subject client list in petitioner's business. Based upon published industry figures, he concluded that a business like the seller's accounting business would realize "operating income" before the owner's salary in the amount of 40 percent of gross receipts. In view of the fact that the subject agreement calls for petitioner to pay 25 percent of the gross receipts to the seller for 48 months, Mr. Meade concluded

that petitioner would receive 15 percent of the gross receipts of the business for the first 4 years and 40 percent of the gross receipts thereafter.  He computed the present value of the amount to be realized by petitioner using a discount rate of 12 percent.

Mr. Meade's analysis assumes that petitioner could expect to lose clients listed on the seller's client list ratably over the useful life of the client list and further assumes that petitioner's gross sales would be reduced pro rata.  For example, if the useful life of the client list were assumed to be 5 years, then Mr. Meade assumed that petitioner would lose 20 percent of the clients and suffer a reduction of gross revenues of 20 percent in the first year, 40 percent in the second year, 60 percent in the third year, 80 percent in the fourth year, and 100 percent in the fifth year.

Mr. Meade made three computations of the present value of the net amount to be realized by petitioner.  The computations assumed that the useful lives of the client list were 5 years, 10 years, and 15 years, respectively. An expanded version of Mr. Meade's computations (in which all columns other than the loss factor and discount factor are expressed in dollars) is as follows:

| 5 Years | Gross Sales 267,000.00 | Loss Factor 20% | Adjusted Sales | Operating Income 40% | Paid to Seller 25% | Net to Buyer 15% | Discount Factor | Present Value Paid to Seller | Present Value Net to Buyer |
|---|---|---|---|---|---|---|---|---|---|
| Year 1 | 267,000.00 | 0.800 | 213,600.00 | 85,440.00 | 53,400.00 | 32,040.00 | 0.892857 | 47,678.56 | 28,607.14 |
| 2 | 267,000.00 | 0.600 | 160,200.00 | 64,080.00 | 40,050.00 | 24,030.00 | 0.797194 | 31,927.62 | 19,156.57 |
| 3 | 267,000.00 | 0.400 | 106,800.00 | 42,720.00 | 26,700.00 | 16,020.00 | 0.711780 | 19,004.53 | 11,402.72 |
| 4 | 267,000.00 | 0.200 | 53,400.00 | 21,360.00 | 13,350.00 | 8,010.00 | 0.635518 | 8,484.17 | 5,090.50 |
| 5 | 267,000.00 | 0.000 | -- | -- | -- | -- | 0.567427 | -- | -- |
| | | | 534,000.00 | 213,600.00 | 133,500.00 | 80,100.00 | | 107,094.88 | 64,256.93 |

| 10 Years | Gross Sales 267,000.00 | Loss Factor 10% | Adjusted Sales | Operating Income 40% | Paid to Seller 25% | Net to Buyer 15%   40% | Discount Factor | Present Value Paid to Seller | Present Value Net to Buyer |
|---|---|---|---|---|---|---|---|---|---|
| Year 1 | 267,000.00 | 0.900 | 240,300.00 | 96,120.00 | 60,075.00 | 36,045.00 | 0.892857 | 53,638.38 | 32,183.03 |
| 2 | 267,000.00 | 0.800 | 213,600.00 | 85,440.00 | 53,400.00 | 32,040.00 | 0.797194 | 42,570.16 | 25,542.10 |
| 3 | 267,000.00 | 0.700 | 186,900.00 | 74,760.00 | 46,725.00 | 28,035.00 | 0.711780 | 33,257.92 | 19,954.75 |
| 4 | 267,000.00 | 0.600 | 160,200.00 | 64,080.00 | 40,050.00 | 24,030.00 | 0.635518 | 25,452.50 | 15 271.50 |
| 5 | 267,000.00 | 0.500 | 133,500.00 | 53,400.00 | -- | 53,400.00 | 0.567427 | -- | 30,300.60 |
| 6 | 267,000.00 | 0.400 | 106,800.00 | 42,720.00 | -- | 42,720.00 | 0.506631 | -- | 21.643.28 |
| 7 | 267,000.00 | 0.300 | 80,100.00 | 32,040.00 | -- | 32,040.00 | 0.452349 | -- | 14,493.26 |
| 8 | 267,000.00 | 0.200 | 53,400.00 | 21,360.00 | -- | 21,360.00 | 0.403883 | -- | 8,626.94 |
| 9 | 267,000.00 | 0.100 | 26,700.00 | 10,680.00 | -- | 10,680.00 | 0.360610 | -- | 3,851.31 |
| 10 | 267,000.00 | -- | (--) | -- | (--) | (--) | 0.321973 | -- | -- |
| | | | 1,201,500.00 | 480,600.00 | 200,250.00 | 280,350.00 | | 154,918.96 | 171,866.77 |

| 15 Years | Gross Sales 267,000.00 | Loss Factor 6.70% | Adjusted Sales | Operating Income 40% | Paid to Seller 25% | Net to Buyer 15%   40% | Discount Factor | Present Value Paid to Seller | Present Value Net to Buyer |
|---|---|---|---|---|---|---|---|---|---|
| Year 1 | 267,000.00 | 0.933 | 249,111.00 | 99,644.40 | 62,277.75 | 37,366.65 | 0.892857 | 55,605.13 | 33,363.08 |
| 2 | 267,000.00 | 0.866 | 231,222.00 | 92,488.80 | 57,805.50 | 34,683.30 | 0.797194 | 46,082.20 | 27,649.31 |
| 3 | 267,000.00 | 0.799 | 213,333.00 | 85,333.20 | 53,333.25 | 31,999.95 | 0.711780 | 37,961.54 | 22,776.93 |
| 4 | 267,000.00 | 0.732 | 195,444.00 | 78,177.60 | 48,861.00 | 29,316.60 | 0.635518 | 31,052.04 | 18 631.23 |
| 5 | 267,000.00 | 0.665 | 177,555.00 | 71,022.00 | -- | 71,022.00 | 0.567427 | -- | 40,299.79 |
| 6 | 267,000.00 | 0.598 | 159,666.00 | 63,866.40 | -- | 63,866.40 | 0.506631 | -- | 32.356.71 |
| 7 | 267,000.00 | 0.531 | 141,777.00 | 56,710.80 | -- | 56,710.80 | 0.452349 | -- | 25,653.09 |
| 8 | 267,000.00 | 0.464 | 123,888.00 | 49,555.20 | -- | 49,555.20 | 0.403883 | -- | 20,014.51 |
| 9 | 267,000.00 | 0.397 | 105,999.00 | 42,399.60 | -- | 42,399.60 | 0.360610 | -- | 15,289.72 |
| 10 | 267,000.00 | 0.330 | 88,110.00 | 35,244.00 | -- | 35,244.00 | 0.321973 | -- | 11,347.62 |
| 11 | 267,000.00 | 0.263 | 70,221.00 | 28,088.40 | -- | 28,088.40 | 0.287476 | -- | 8,074.74 |
| 12 | 267,000.00 | 0.961 | 52,332.00 | 20,932.80 | -- | 20,932.80 | 0.256675 | -- | 5,372.93 |
| 13 | 267,000.00 | 0.129 | 34,443.00 | 13,777.20 | -- | 13,777.20 | 0.229174 | -- | 3,157.38 |
| 14 | 267,000.00 | 0.062 | 16,554.00 | 6,621.60 | -- | 6,621.60 | 0.204620 | -- | 1,354.91 |
| 15 | 267,000.00 | -- | -- | -- | -- | -- | 0.182696 | -- | -- |
| | | | 1,859,655.00 | 743,862.00 | 222,277.50 | 521,584.50 | | 170,700.91 | 265,341.95 |

Set out below is a summary of Mr. Meade's three cash-flow analyses which show, on a present value basis, the total operating income to be derived from the seller's clients, the portion of the operating income that would be paid to the seller, and the net amount to be derived by petitioner:

| | Total Operating Income | Amount Paid to Seller | Net to Buyer |
|---|---|---|---|
| 5 years | $171,351.81 | $107,094.88 | $64,256.93 |
| 10 years | 326,785.73 | 154,918.96 | 171,866.77 |
| 15 years | 436,042.86 | 170,700.91 | 265,341.95 |

Based upon the above computations, Mr. Meade concludes that the useful life of the client list in petitioner's business must be at least 15 years in order to permit petitioner to realize an amount, $265,341.95, that approximates the gross sales of the business in 1986, the year prior to the subject transaction, in the amount of $267,000.  Mr. Meade described this amount during his testimony as "the historical economic value of the prac-tice".  Thus, Mr. Meade equates the gross receipts from the subject accounting business for 1 year with the "economic value" of the business to the owner.  It is not evident to us why a hypothetical buyer would enter into the trans-action only if the buyer netted approximately $267,000.

Allocation Between Client List and Going Concern

In UFE, Inc. v. Commissioner, 92 T.C. 1314, 1323 (1989), we described going-concern value as follows:

> Going-concern value is an intangible,
> nonamortizable capital asset that is often
> considered to be part of goodwill.  Goodwill
> has been defined as the "expectancy of both
> continuous excess earning capacity and also of
> competitive advantage or continued patronage."
> Wilmot Fleming Engineering Co. v. Commissioner,
> 65 T.C. 847, 861 (1976).  (Emphasis added.)  On
> the other hand, going-concern value has also
> been described as related less to the business
> reputation and the strength of customer loyalty,
> than to the operating relationship of assets
> and personnel inherent in an ongoing business.
> Going-concern value has been defined as "the

additional element of value which attaches to property by reason of its existence as an integral part of a going concern." VGS Corp. v. Commissioner, 68 T.C. 563, 591 (1977); Conestoga Transportation Co. v. Commissioner, 17 T.C. 506, 514 (1951). Going-concern value is manifested in the business' ability to resume business activity without interruption and to continue generating sales after an acquisition. Computing & Software Inc. v. Commissioner, 64 T.C. 223, 235 (1975). While courts have blurred these distinctions between goodwill and going-concern value, they are different conceptually. See United States v. Cornish, 348 F.2d 175, 184 (9th Cir. 1965); Computing & Software Inc. v. Commissioner, supra at 234-235; Winn-Dixie Montgomery, Inc. v. United States, 444 F.2d 677, 685 (5th Cir. 1971).

See also VGS Corp. v. Commissioner, 68 T.C. 563, 591-592 (1977).

In this case, the effect of petitioner's agreement with the seller was that petitioner stepped into the seller's shoes. He not only acquired the seller's clients, but he also took over the seller's office equipment, his office, and his employees. While the subject agreement dealt solely with the seller's clients and did not expressly concern the seller's office equipment, office, and employees, the seller made it possible for petitioner to acquire the seller's ongoing business. The business continued uninterrupted. Thus, in this transaction, we believe, there was an element of going-concern value. UFE, Inc. v. Commissioner, supra; VGS Corp. v. Commissioner, supra. This was particularly important to

petitioner, who had worked for the seller for approximately 7 years and had become familiar with the seller's business during that period.

Based upon the above, we find that petitioners have failed to rebut the conclusions of respondent's expert, Mr. Meade, who allocated approximately 10 percent of the purchase price to going-concern value and the remainder to the client list.  Accordingly, we find that, of the amount that petitioner paid to the seller, $161,225, approximately 10 percent or $16,000 should be allocated to going-concern value and the remainder, $145,225, should be allocated to the client list.

Useful Life of the Client List

We find that petitioner's expert, Dr. Alexander, has understated the useful life of the subject client list. Similarly, we find that respondent's expert, Mr. Meade, has overstated the useful life of the client list.  We may choose to accept the opinion of one expert in its entirety, Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980), or we may be selective in the use of any portion of such an opinion, see Parker v. Commissioner, 86 T.C. 547, 562 (1986); Estate of Bennett v. Commissioner, T.C. Memo. 1989-681, affd. without published opinion 935 F.2d 1285 (4th Cir. 1991). Based upon all of the facts and circumstances of this case

and taking into account the analyses of both experts, we find that the useful life of the subject client list in petitioner's business is 7 years.

Accuracy-Related Penalties

Respondent determined that petitioners are liable for the accuracy-related penalty under section 6662(a) for 1989 in the amount of $2,239 and that petitioner is liable for the penalty for 1990 in the amount of $2,718. Respondent determined that the underpayment of tax for both years was due to negligence or disregard of rules or regulations, a substantial understatement of income tax, or "a substantial valuation overstatement." Petitioners bear the burden of proving that respondent's determination is wrong and that they are not liable for the accuracy-related penalty. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

Petitioners make the following argument that the penalty should not apply:

> Clearly, Welch relied upon his own expertise as well as the expertise of the [seller's] attorney, [who was] experienced income tax matters [and] who prepared the Agreement. (Tr. 26) And, in view of the authorities described herein it is clear that there is substantial authority for the position taken with respect to reporting deductions for the amounts paid by Welch under the Agreement and therefore [there was] no substantial under-statement (Section 6662(d)(2)(B)) and clearly no negligence or disregard of rules and regulations.

Generally, if a taxpayer proves good faith and reasonable reliance upon the advice of a competent and experienced accountant or attorney in the preparation of his or her return, the addition to tax for negligence is inapplicable. Weis v. Commissioner, 94 T.C. 473, 487 (1990); Conlorez Corp. v. Commissioner, 51 T.C. 467, 475 (1968). In order to prove such reliance, the taxpayer must establish that the return preparer was supplied with all necessary information and the incorrect return was the result of the preparer's mistakes. Weis v. Commissioner, supra.

In this case, there is no evidence that petitioner received advice from the seller's attorney concerning the deductions claimed on the subject returns or anything else. The fact that the subject agreement was prepared by the seller's attorney and that he may have been a tax attorney does not establish that petitioners relied upon any advice from the seller's attorney in claiming the deductions at issue in this case.

Similarly, we reject petitioners' claim that they relied upon petitioner's expertise. Petitioners deducted the subject payments to the seller's assignee on the theory that the payments were attributable to the seller's covenant not to compete. Respondent determined that petitioners are liable for the penalty on the ground that

the covenant not to compete had no basis in reality. As described above, we sustained respondent's determination as a matter of fact. Petitioners do not explain what "expertise" petitioner supplied. Moreover, petitioner testified that he did not have experience working with covenants not to compete. Furthermore, contrary to petitioners' assertion that there is "substantial authority" for the subject deductions, there is no authority of any kind to claim amortization deductions with respect to a covenant not to compete that lacks economic reality.

Based on the foregoing, we sustain respondent's determinations pertaining to the section 6662 penalty.

To reflect the foregoing,

Decision will be entered

under Rule 155.